Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2003      Decided June 20, 2003

No. 02-1123 & No. 02-1124

FRIENDS OF THE EARTH,
PETITIONER

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND
CHRISTINE TODD WHITMAN, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

On Petitions for Review of Orders of the
Environmental Protection Agency

*Howard I. Fox* argued the cause for the petitioner. *Keri N. Powell* was on brief.

*Scott J. Jordan*, Attorney, United States Department of Justice, argued the cause for the respondent. *Carol A. Siciliano*, Attorney, United States Environmental Protection Agency, was on brief.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Alexandra D. Dunn, Stewart T. Leeth* and *David E. Evans* were on brief for *amici curiae* Association of Metropolitan Sewerage Agencies and DC Water and Sewer Authority in support of the respondent.

Before: Ginsburg, *Chief Judge*, and Edwards and Henderson, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* Henderson.

Karen LeCraft Henderson, *Circuit Judge*: Petitioner Friends of the Earth (FOE) seeks review of the decision by the Environmental Protection Agency (EPA) to issue limits—known as total maximum daily loads (TMDLs)—on certain pollutants discharged into the upper and lower Anacostia River in the District of Columbia. FOE claims that the Anacostia River TMDLs for biochemical oxygen demand (BOD) and total suspended solids (TSS) violate the Clean Water Act (CWA or Act), 33 U.S.C. §§ 1251 *et seq.*, and its implementing regulations in several respects.[1] EPA challenges these contentions on the merits and, in addition, asserts that this court lacks original jurisdiction to review this sort of agency action. We agree with EPA that we lack jurisdiction and, accordingly, dismiss the petitions for review and transfer the case to the district court for consideration under the judicial review provisions of the Administrative Procedure Act (APA). *See* 5 U.S.C. §§ 701–706.

## I.

The Congress adopted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the Act requires point sources[2] of pollution to meet

---

[1] For the sake of both clarity and consistency, we refer to the CWA's codified section numbers rather than the section numbers used in the Act.

[2] A "point source" is "any discernible, confined and discrete conveyance," such as a pipe, tunnel or well, "from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

certain technology-based effluent limitations.[3] *Id.* § 1311(b)(1)(A)-(B). "[The CWA's] effluent limitation approach focuses on regulating, through the issuance of permits and required technology-based abatement methods, the amount of pollutants discharged by a pollution source." *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 94 (2d Cir. 2001) (internal quotations omitted). Because the Congress recognized that the effluent limitation approach could not achieve the Act's objectives alone, however, the CWA also employs a water-quality-based approach to controlling water pollution, requiring states to adopt water quality standards[4] sufficient "to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter." 33 U.S.C. § 1313(c)(2)(A). If a state does not set water quality standards—or if EPA determines that a state's standards do not meet the requirements of the Act—EPA promulgates the water quality standards for the state. *Id.* § 1313(b), (c)(3)-(4).

If the required effluent limitations are "not stringent enough to implement [the] water quality standard[s] applicable" to a waterbody, the CWA requires that the state "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." *Id.* § 1313(d)(1)(A). For waterbodies so classified, the state is required to establish the "total maximum daily load" for pollutants identified by EPA as suitable for TMDL calculation. *Id.* § 1313(d)(1)(C). The state must establish

---

[3] "The term 'effluent limitation' means any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

[4] A "water quality standard" specifies a waterbody's "designated uses" and "water quality criteria," taking into account the water's "use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes," as well as its "use and value for navigation." 33 U.S.C. § 1313(c)(2).

each TMDL "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." *Id.* Thus, a TMDL represents the maximum amount of pollutant "loadings" that a waterbody may take in without violating applicable water quality standards, taking into account both seasonal variations and a margin of safety.[5] Each state must then submit its "priority list" and the corresponding TMDLs for EPA approval. *Id.* § 1313(d)(2). The District of Columbia is considered a "state" for purposes of the CWA. *Id.* § 1362(3).

Because it violates several of the water quality standards established by the District and approved by EPA,[6] the Anacostia River has been identified for TMDL development pursuant to section 1313(d)(1)(A). Two of the District's water quality standards are at issue here: the dissolved oxygen standard[7] and the turbidity standard.[8] The former sets both

---

[5] EPA's regulations define the TMDL for a pollutant as the sum of (1) the "wasteload allocation" for point source pollution; (2) the "load allocation" for non-point source or natural background pollution; and (3) a margin of safety. *See* 40 C.F.R. § 130.2(g)-(i).

[6] For the purpose of water quality standards, the District has classified the Anacostia River for the following beneficial uses: primary contact recreation (Class A); secondary contact recreation and aesthetic enjoyment (Class B); protection and propagation of fish, shellfish and wildlife (Class C); protection of human health related to consumption of fish and shellfish (Class D); and navigation (Class E). D.C. MUN. REGS. tit. 21, § 1101.1–2.

[7] "Dissolved oxygen is a basic requirement for a healthy aquatic ecosystem." EPA, NATIONAL WATER QUALITY INVENTORY: 1998 RE- PORT TO CONGRESS 17 (Aug. 1998) (WATER QUALITY INVENTORY), *available at* http://www.epa.gov/305b/98report/index.html; *see also Natural Res. Def. Council, Inc. v. EPA*, 656 F.2d 768, 771 (D.C. Cir. 1981) ("The decomposition of organic matter consumes oxygen, and excessive oxygen demands may deprive fish, shellfish and aquatic wildlife of dissolved oxygen necessary to life."). Dissolved oxygen violations can be traced to "biochemical oxygen demand" or "BOD," a measure of "pollutants which, when they decompose, deplete

daily and hourly minimum oxygen levels for the District's waters, *see* D.C. Mun. Regs. tit. 21, § 1104.6, while the latter establishes the District's standards relating to water clarity, *see id*. §§ 1104.1, 1104.7, 1105.5. In December 2001, the EPA approved a TMDL—submitted by the District—addressing the dissolved oxygen standard. Shortly thereafter, in March 2002, EPA established a second TMDL addressing the District's turbidity standard. Upon the issuance of EPA's final decisions, FOE petitioned this court for review of both TMDLs, claiming that they are inadequate to achieve the District's water quality standards.

## II.

EPA has moved to dismiss FOE's petitions, arguing that we lack subject matter jurisdiction under 33 U.S.C. § 1369(b)(1) to review the approval or establishment of TMDLs made pursuant to section 1313(d). Emphasizing that actions taken under section 1313 are not included among the listed actions expressly made directly reviewable by the courts of appeals under section 1369(b)(1), EPA maintains that challenges to the approval or establishment of TMDLs must be brought—if at all—in district court under the APA. FOE reads the CWA's jurisdictional provision in a decidedly different fashion, arguing that EPA's approval and establishment of TMDLs fall within the "plain scope" of section 1369(b)(1)(E). Br. for Pet'r at 14. In its view, both the plain terms of the Act as well as United States Supreme Court and D.C. Circuit precedent compel the conclusion that TMDLs are "effluent limitation[s] or other limitation[s] under section

---

oxygen necessary to support aquatic life." *Am. Meat Inst. v. EPA*, 526 F.2d 442, 447 (7th Cir. 1975). When BOD increases in a waterbody, dissolved oxygen concentrations decrease.

[8] "Turbidity is an optical property of very small particles that scatter light and reduce clarity in waterbodies." Water Quality Inventory at 21. Turbidity violations can be traced to "total suspended solids" or "TSS," which are "particles of organic and inorganic matter suspended in the water or floating on its surface." *Am. Meat Inst.*, 526 F.2d at 447.

1311," 33 U.S.C. § 1369(b)(1)(E), and that, as a result, direct review of EPA's actions comes within our jurisdiction. We are not persuaded by the petitioner's argument.

"A federal court's subject-matter jurisdiction, constitutionally limited by [A]rticle III, extends only so far as [the] Congress provides by statute." *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984) (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701–02 (1982)). Our original jurisdiction to review EPA actions taken pursuant to the CWA is governed by 33 U.S.C. § 1369(b)(1).[9] Of relevance here, section 1369(b)(1)(E) provides for direct review in the court of appeals of EPA action "in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title." 33 U.S.C. § 1369(b)(1)(E). Although EPA's authority to approve and establish TMDLs is provided for under section 1313—a statutory provision not among those listed in section 1369(b)(1)(E)—FOE argues that the plain terms of the Act compel the conclusion that TMDLs constitute "effluent limitation[s] or other limitation[s] *under section*

---

[9] Section 1369(b)(1) grants original jurisdiction to the courts of appeals as follows: "Review of the [EPA] Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(*l*) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day." 33 U.S.C. § 1369(b)(1).

*1311*." *Id.* (emphasis added).[10] However, "[i]n view of the specificity of the [CWA's] judicial review provision, [the] omission [of section 1311] presents [FOE] with considerable difficulty in establishing jurisdiction in this court." *Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 514 (2d Cir. 1976) (appellate court lacked jurisdiction to review EPA action, taken pursuant to section 1313, partially approving New York's thermal water quality standards); *see also Original Honey Baked Ham Co. of Ga. v. Glickman*, 172 F.3d 885, 887 (D.C. Cir. 1999) ("A statute listing the things it does cover exempts, by omission, the things it does not list.").

The statutory basis for FOE's argument is section 1311(b)(1)(C), which requires that there be achieved, "not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance . . . required to implement any applicable water quality standard established pursuant to this chapter." 33 U.S.C. § 1311(b)(1)(C). Asserting that TMDLs are both "more stringent limitation[s]" and limitations "necessary to meet water quality standards,"[11] *id.*, FOE maintains that TMDLs are thus properly considered limitations "under section 1311," *id.* § 1369(b)(1)(E). It therefore reasons that section 1369(b)(1)(E) provides the

---

[10] EPA does not contest FOE's assertion that a TMDL constitutes an "effluent limitation or other limitation" within the meaning of section 1369(b)(1)(E). *See* Br. for Resp't at 14–29; *see also Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1310 (9th Cir. 1992) ("EPA concedes that [a] total maximum daily load is an effluent limitation."). Accordingly, the only question before us is whether TMDLs constitute effluent limitations or other limitations "under section 1311." 33 U.S.C. § 1369(b)(1)(E).

[11] As previously discussed, *see supra* p. 3, states must establish TMDLs for "those waters . . . for which the effluent limitations required by [section 1311] *are not stringent enough* to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A) (emphasis added). Moreover, they must "be established at a level necessary to implement the applicable *water quality standards*." *Id.* § 1313(d)(1)(C) (emphasis added).

courts of appeals with original jurisdiction to review EPA's approval and establishment of TMDLs.

As EPA correctly observes, however, the courts of appeals have consistently held that the express listing of specific EPA actions in section 1369(b)(1) precludes direct appellate review of those actions not so specified. *See, e.g.*, *City of Baton Rouge v. EPA*, 620 F.2d 478, 480 (5th Cir. 1980) ("Thus, the rule is clear: the [c]ourts of [a]ppeals have jurisdiction for direct review only of those EPA actions specifically enumerated in 33 U.S.C. § 1369(b)(1)."); *Bethlehem Steel*, 538 F.2d at 517 ("[T]he complexity and specificity of section [1369(b)(1)] in identifying what actions of EPA under the [CWA] would be reviewable in the courts of appeals suggests that not all such actions are so reviewable."); *see also Minn. Center for Envtl. Advocacy v. EPA*, No. 03–1636 (8th Cir. April 28, 2003) (dismissing challenge to EPA's approval of TMDL for want of jurisdiction); *Alcoa, Inc. v. EPA*, No. 02–13562–II (11th Cir. Oct. 16, 2002) (same). We agree with our sister circuits: original jurisdiction over EPA actions not expressly listed in section 1369(b)(1) lies not with us, but with the district court.

Indeed, addressing the precise issue raised here, the Ninth Circuit held in *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307 (9th Cir. 1992), that it lacked original jurisdiction to review TMDLs established by EPA under section 1313(d).[12]

---

[12] The Ninth Circuit also addressed whether the list of provisions in section 1369(b)(1)(E) modifies the entire phrase "any effluent limitation or other limitation" or simply the closer antecedent, *i.e.*, "other limitation." *Longview*, 980 F.2d at 1310–11. Although it noted that the rules of syntax favor the latter construction, *id.* at 1311 (citing 2A SINGER, SUTHERLAND–STATUTORY CONSTRUCTION § 47.33 (5th ed. 1992)), the Ninth Circuit adopted the former construction, emphasizing that one of the listed provisions—section 1312—deals solely with effluent limitations, *id.* Reasoning that the syntactically favored construction would produce an absurdity—" 'non-effluent limitations under an effluent limitations statute' "—the Ninth Circuit concluded that the Congress "intended the modifier to apply *both* to 'effluent' and to 'other' limitations." *Id.* (emphasis added). Because FOE does not argue that the list of provisions in section 1369(b)(1)(E) mod-

In doing so, the Ninth Circuit specifically rejected the statutory argument—also advanced by FOE here—that section 1311(b)(1)(C) encompasses section 1313 effluent limitations such as TMDLs. *Id.* at 1311–14. Emphasizing that section 1311's oblique reference to section 1313 is contained within a "[t]imetable for achievement of objectives," requiring the achievement of certain limitations "not later than July 1, 1977," 33 U.S.C. § 1311(b)(1), the Ninth Circuit concluded that section 1311(b)(1)(C) is insufficient "to get a section 1313 [TMDL] . . . into an appellate statute designating [review of] section 1311 [actions]," *Longview*, 980 F.2d at 1312.

The Ninth Circuit relied on the principle *expressio unius est exclusio alterius* to conclude that "[t]he specificity and precision of section 1369" indicates a congressional intent "to exclude the unlisted section 1313" from direct appellate court review. *Id.* at 1313; *see also Bethlehem Steel*, 538 F.2d at 517 ("If [the] Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others."). "It would be an odd use of language," the Ninth Circuit observed, "to say 'any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title' in [section] 1369(b)(1)(E) if the references to particular sections were not meant to exclude others." *Longview*, 980 F.2d at 1313. Noting, for example, that "review of a 'standard of performance under section 1316' is established by a different subsection from review of a 'determination pursuant to section 1316(b)(1)(C),'" the Ninth Circuit reasoned that the "fine" distinctions drawn by section 1369(b)(1) rendered the "negative pregnant . . . all the more obvious." *Id.*

Other structural aspects of the CWA also undermine FOE's broad reading of section 1369(b)(1)(E).[13] To begin

_____

ifies only "other limitations," we need not delve into matters of syntax here.

[13] Relying on the title of section 1311 ("Effluent limitations") and the fact that the CWA defines an effluent limitation as a restriction on discharges "from point sources," 33 U.S.C.

with, the Congress differentiated between section 1311 effluent limitations and section 1313 effluent limitations throughout the CWA. *See, e.g.*, 33 U.S.C. § 1342(o)(1) ("In the case of effluent limitations established on the basis of section 1311(b)(1)(C) *or* section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.") (emphasis added); *see also id.* § 1326(c) (providing for period of protection from more stringent effluent limitations with respect to thermal component of discharge if, *inter alia*, point source "meets effluent limitations established under section 1311 of this title *or*, if more stringent, effluent limitations established under section 1313 of this title") (emphasis added). The distinction drawn by such provisions "suggests that even where [the] Congress regarded a section 1313 device as an 'effluent limitation,' nevertheless it did not regard it as the same thing as a section 1311 effluent limitation." *Longview*, 980 F.2d at 1312.

Moreover, as EPA emphasizes on review, FOE's reading of section 1311(b)(1) renders several provisions of section 1369(b)(1) superfluous. Under its reading of section 1311(b)(1), for example, effluent limitations under section 1312—water quality related effluent limitations—would constitute "effluent limitation[s] or other limitation[s] under section 1311" because they are limitations "necessary to meet water quality standards." Yet, as EPA correctly observes, section 1369(b)(1) *expressly* provides for original appellate court review of section 1312 actions. 33 U.S.C.

§ 1362(11), EPA argues that TMDLs should not be considered effluent limitations "under section 1311" because the latter apply to waters impaired by both point and non-point sources. This argument suffers from several flaws, including a failure to recognize that section 1369(b)(1)(E) refers to "any effluent limitation *or other limitation* under section 1311." *Id.* § 1369(b)(1)(E) (emphasis added). Given that TMDLs constitute "other limitation[s]" within the meaning of section 1369(b)(1)(E), we reject EPA's "point source" argument.

§ 1369(b)(1)(E). Thus, if accepted, FOE's reading would render section 1369(b)(1)(E)'s specific reference to section 1312 duplicative and unnecessary. In our view, the better reading of the statute interprets the phrase "under section 1311" to cover a specific set of EPA actions and, as a result, to afford meaning to section 1369(b)(1)(E)'s express reference to section 1312.[14] *See, e.g., Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of interpretation requires us to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant.") (internal quotations omitted).

Despite these compelling statutory arguments, FOE urges us not to follow the Ninth Circuit's rationale in *Longview*, citing contrary precedent from both this circuit and the Supreme Court. It relies chiefly on *Public Utility District No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700 (1994) (*PUD No. 1*), a case decided nearly eighteen months after the Ninth Circuit decided *Longview*.[15] In *PUD*

---

[14] FOE's reading of section 1311 would likewise render superfluous section 1369(b)(1)(C)'s express reference to section 1317. Under its reasoning, section 1311(b)(1)(A)'s specific reference to "any requirements under section 1317 of this title" and section 1311(b)(1)(C)'s oblique reference to limitations necessary to meet "treatment standards" would convert any limitations under section 1317, which addresses toxic and pretreatment effluent standards, into limitations "under section 1311," thereby subjecting those limitations to original appellate court review. As with the section 1312 actions discussed in the text, however, EPA actions under 1317 are expressly made subject to direct review in the courts of appeals under section 1369(b)(1). 33 U.S.C. § 1369(b)(1)(C) (providing for direct appellate court review of actions "in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title").

[15] Friends of the Earth also relies on two decisions of this court, *American Iron & Steel Institute v. EPA*, 115 F.3d 979 (D.C. Cir. 1997), and *Natural Resources Defense Council, Inc. v. EPA*, 673 F.2d 400 (D.C. Cir.), *cert. denied*, 459 U.S. 879 (1982), to support its broad reading of section 1369(b)(1). Its reliance is misplaced, however, as both decisions involved EPA actions *ex-*

*No. 1*, the Supreme Court considered whether a state had the authority under 33 U.S.C. § 1341 to condition its water quality certification on a minimum stream flow requirement.[16] *Id*. at 710. Under section 1341(d), a state must ensure that its water quality certifications comply "with any applicable effluent limitations and other limitations, *under section 1311 or 1312 of this title*," certain other specified provisions of the CWA, "and with any other appropriate requirement of State law." 33 U.S.C. § 1341(d) (emphasis added).

Although the State of Washington imposed the minimum stream flow requirement at issue to ensure compliance with water quality standards adopted pursuant to *section 1313*—a statutory provision not among those listed in section 1341(d)—the Supreme Court concluded that "ensuring compliance with [section 1313] is a proper function of the [section 1341] certification." *PUD No. 1*, 511 U.S. at 712. The Supreme Court based its decision on the fact that section 1341(d) allows states to impose limitations to ensure compliance with section 1311. *Id*. at 712–13. Noting that "[s]ection [1311] in turn incorporates [section 1313] by reference," *id*. at 713 (citing 33 U.S.C. § 1311(b)(1)(C); H.R. REP. No. 95–830, at 96 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4471), the Supreme Court held that "state water quality standards adopted pursuant to [section 1313] are among the 'other limitations' with which a [s]tate may ensure compliance through the [section 1341] certification process," *id*. "This

*pressly specified* in section 1369(b)(1). *See Am. Iron & Steel Inst.*, 115 F.3d at 985–86 (exercising jurisdiction over water quality guidance document issued by EPA where (1) portion of guidance document contained effluent limitations *under section 1311* and (2) remainder fell within ancillary jurisdiction of court); *Natural Res. Def. Council*, 673 F.2d at 405 n.15 (exercising jurisdiction over Consolidated Permit Regulations where EPA promulgated regulations *under section 1311*).

[16] Section 1341 requires states to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters. 33 U.S.C. § 1341.

interpretation is consistent," the Supreme Court observed, "with EPA's view of the statute." *Id.*

Not surprisingly, FOE places particular emphasis on the Supreme Court's statement in *PUD No. 1* that "[s]ection [1311] in turn incorporates [section 1313] by reference." *Id.* Asserting that "[l]ike [section 1341(d)], [section 1369(b)(1)(E)] expressly references [section 1311], which " 'in turn, incorporates [section 1313] by reference,' " FOE argues that TMDLs adopted " 'pursuant to [section 1313] are among the "other limitations" ' " within this [c]ourt's [section 1369(b)(1)(E)] review jurisdiction." Br. for Pet'r at 17 (quoting *PUD No. 1*, 511 U.S. at 713).

In effect, FOE's argument asks us to depart from firmly established circuit precedent—not to mention the plain language of the CWA—on the basis of a single isolated statement appearing in the Supreme Court's opinion in *PUD No. 1*, without taking into consideration the basis and context of that statement. This we decline to do. As EPA correctly observes, the Supreme Court supported its "incorporated by reference" statement with a citation to the legislative history of the 1977 CWA amendments. *PUD No. 1*, 511 U.S. at 713 (quoting H.R. REP. No. 95–830, at 96 ("Section [1313] is always included by reference where section [1311] is listed.")).[17] Inasmuch as the amendment which is the subject of the cited House Conference Report involved section 1341, the Supreme Court's reliance on this legislative history is hardly surprising.[18]

[17] As earlier noted, the Supreme Court also cites section 1311(b)(1)(C) in support of its conclusion that that section 1311 "incorporates" section 1313 "by reference." *PUD No. 1*, 511 U.S. at 713. The Supreme Court fails to explain, however, how section 1311(b)(1)(C) is to be read so as to lead to this conclusion. *See id.*

[18] *See* An Act to amend the Federal Water Pollution Control Act, Pub. L. No. 95–217, § 64, 91 Stat. 1566, 1599 (1977) ("Section 401 of the [CWA] is amended by inserting '303,' after '302,' in the phrase 'sections 301, 302, 306, and 307 of this Act', and in the phrase 'section 301, 302, 306, or 307 of this Act', each time these phrases appear."). "Translating the Act references to [United States] Code

The legislative history of the 1977 CWA amendments sheds no light, however, on the proper scope of section 1369(b)(1), enacted in 1972. As the Ninth Circuit explained in *Longview*, it is irrelevant to the question at hand:

> This legislative history does not persuade us, because it is not part of the law, was written long after the law was passed, and seems inconsistent with the law passed when it was written. This is 1977 'history' about a 1972 law. Instead of giving us a window into the thinking of the legislators who wrote the bill, it gives us the advice of someone on a House Conference Committee staff *five years after section 1369 was promulgated* about how we should construe a law passed by an earlier Congress under a different president in a different political era.

*Longview*, 980 F.2d at 1311–12 (emphasis in original). Noting that the 1977 Act amended section 1341, not section 1369, and that section 1369(b)(1)(E) lists statutory provisions other than those listed in section 1341, the Ninth Circuit further explained that "[t]here would be no point in passing the referenced section of the 1977 law if the history were correct, and no point in writing the history if the law said what [the] Congress intended." *Id.* at 1312.

To be sure, the Supreme Court's decision in *PUD No. 1* involved section 1341(d), a provision that the Congress did not amend in 1977. *Id.* at 711–13. But this fact does not render the legislative history of the 1977 CWA amendments any more applicable to section 1369(b)(1). Moreover, we are loath to part company with our sister circuits on the basis of a single sentence in the Supreme Court's *PUD No. 1* opinion, particularly since that opinion involved a substantive regulatory provision of the CWA—section 1341(d)—and not the jurisdictional provisions of section 1369(b)(1).[19] *See Cheng*

references yields, 'Section 1341 [of the CWA] is amended by inserting '1313' after '1312,' in the phrase 'section 1311, 1312, 1316, and 1317 of the Act,' and in the phrase 'section 1311, 1312, 1316, or 1317 of this Act,' each time these phrases appear.' " *Longview*, 980 F.2d at 1312.

[19] We also note the fact that the water quality certification issue addressed by the Supreme Court in *PUD No. 1* originated in

*Fan Kwok v. INS*, 392 U.S. 206, 212 (1968) ("As a jurisdictional statute, it must be construed both with precision and with fidelity to the terms by which [the] Congress has expressed its wishes."). We are especially loath to do so in light of the language and structure of the Act, both of which undermine FOE's proposed reading.[20]

We are thus "persuaded that [the] [C]ongress and the [P]resident decided to leave section 1313 out of the list of statutes in section 1369 for direct appeal from [ ] EPA to the [c]ourt of [a]ppeals." *Longview*, 980 F.2d at 1314. In reaching this conclusion, however, we echo the sentiments of the Second Circuit, which observed: "It would be too much to say that we construe this confusing statute with confidence. But construe it we must, consoled by the knowledge that if our interpretation of the intent of [the] Congress is incorrect, [the] Congress can easily correct it." *Bethlehem Steel*, 538 F.2d at 518. Given the specificity of the CWA's judicial review provision, we join our sister circuits in holding that the courts of appeals have original jurisdiction to review only those EPA actions specifically enumerated in 33 U.S.C. § 1369(b)(1).

## III.

For the foregoing reasons, we dismiss the petitions for review for lack of jurisdiction and transfer the case to the

---

the state courts of Washington. *PUD No. 1*, 511 U.S. at 709–10. This is another reason that the sentence on which FOE relies cannot bear the dispositive weight FOE places on it—because *PUD No. 1* went to the Supreme Court on *writ of certiorari* from the Washington Supreme Court, we doubt that the CWA's division of review between the federal courts of appeals and the federal district courts played any part in the Supreme Court's formulation of the "incorporated by reference" sentence.

[20] As previously noted, two of our sister circuits recently dismissed challenges to EPA's approval of a TMDL for want of jurisdiction. *Minn. Center for Envtl. Advocacy v. EPA*, No. 03–1636 (8th Cir. April 28, 2003); *Alcoa, Inc. v. EPA*, No. 02–13562–II (11th Cir. Oct. 16, 2002). Neither circuit, however, addressed *PUD No. 1*.

district court for consideration under the judicial review provisions of the APA.

*So ordered.*