**Amigos BRAVOS, Plaintiff,**

v.

**Richard GREEN, Regional Administrator, Region VI, United States Environmental Protection Agency, et al.,[1] Defendants.**

**Civil Action No. 00–1615 (RBW).**

United States District Court,
District of Columbia.

March 3, 2004.

---

1. Pursuant to Fed.R.Civ.P. 25(d), Richard Green has been substituted as the named defendant Regional Administrator, Region VI, in this case. Similarly, defendant Mike Leavitt has been substituted as the Administrator of the EPA.

Ari Micha Wilkenfeld, Bernabei and Katz, PLLC, Washington, DC, Mary–Lynn Sferrazza, Matthew Bishop, Western Environmental Law Center, Taos, NM, for Plaintiff.

Eileen T. McDonough, U.S. DOJ–Environmental Defense Section, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

WALTON, District Judge.

This lawsuit involves the issue of whether, pursuant to the Clean Water Act, 33 U.S.C. §§ 1251–1387 (2000), the Environmental Protection Agency's ("EPA") alleged approval of the State of New Mexico's implementation plan regarding the attainment of Total Maximum Daily Loads ("TMDLs"), was arbitrary and capricious. Currently before the Court are the parties' motions for summary judgment. Concluding that there has been no final agency action in this matter, the Court will grant the defendants' motion and dismiss plaintiff's complaint.

## I.  Factual Background

Resolution of the issues presented in this case, although not requiring an extensive analysis of the intricacies of the Clean Water Act's regulatory scheme, "requires a familiarity with the history, the structure, and alas, the jargon of the federal water pollution laws." *Pronsolino v. Nastri,* 291 F.3d 1123, 1126 (9th Cir.2002) (quoting *Natural Res. Def. Council v. EPA,* 915 F.2d 1314, 1316 (9th Cir.1990)). The Court will therefore begin its discussion with a brief overview of the statutory provisions at issue in this case.

### A.  The Regulatory Scheme

Congress passed the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act ("CWA" or "Act"), in 1972 with the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. In furtherance of this objective, Congress declared that a "national goal" of the CWA would be to eliminate "the discharge of pollutants into the navigable waters ... by 1985." *Id.* § 1251(a)(1). The EPA has responsibility for enforcing the Act. *Id.* § 1251(d).

There are two potential sources of pollution that the EPA's regulatory program targets: point sources and nonpoint sources. A point source is defined in the Act as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Examples of such sources are pipes, tunnels, or wells. *Friends of the Earth v. EPA,* 333 F.3d 184, 186 n. 2 (D.C.Cir.2003). Although the term nonpoint source is not defined in the Act, "it is generally defined by exclusion to mean any pollutant source other than a point source, including, for example, runoff from agricultural fields." Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross Motion for Summary Judgment ("Defs.' Opp'n") at 4 (citing *National Wildlife Fed'n v. Gorsuch,* 693 F.2d 156, 165–66, 176 (D.C.Cir.1982)).

Point sources were addressed in the 1972 amendments to the Act, wherein Congress prohibited the discharge of any pollutant from a point source into certain waters unless the discharge complied with the strict requirements of the Act. *See* 33 U.S.C. §§ 1311(a), 1311(b)(2). This approach focuses on technology-based controls to limit the amount of pollutant discharge through the utilization of the EPA's National Pollution Discharge Elimination System ("NPDES") permit program. 33 U.S.C. § 1342. The NPDES permit program, applicable only to point sources, "is the principal means for implementing both

the technology-based regulations and the water quality standards." Defs.' Opp'n at 7 (citing 33 U.S.C. § 1342(a); other citation omitted). NPDES permits limit the amount of pollutant that can be discharged by a point source and are federally enforceable. *Id.*

Although the technology-based point source program was intended to be the primary means for controlling water pollution, because solely targeting point source pollution was insufficient to restore certain rivers, streams or smaller bodies of water, the Act also utilizes a water-quality based approach, which first "originated in the Water Quality Act of 1965, Pub.L. No. 89–234, 79 Stat. 903." Defs.' Opp'n at 5. This approach involves assigning each body of water "a specific water · quality standard and that standard establishes the level of pollution that can be present in the waterbody, regardless of the source of pollution." *Id.* at 4–5.

Nonpoint source pollution is primarily regulated by the States through the water-quality approach. Defs.' Opp'n at 7 (citations omitted). Section 303(d) of the CWA requires each State to identify and rank those waters within its boundaries where technology-based controls are inadequate to attain quality water standards. 33 U.S.C. § 1313(d)(1)(A). Such substandard waters are termed "water quality limited segments" ("WQLSs") and are listed on a State's § 303(d) list. Defs.' Opp'n at 8; 40 C.F.R. § 130.7(b). The State must submit

documentation to its EPA Regional Administrator supporting its decision to list, or not list, waters on its § 303(d) list. 40 C.F.R. § 130.7(b)(6). For each body of water identified on its § 303(d) list, the State must establish the body's total maximum daily load ("TMDL"). *Id.* § 130.7(c)(1). Simply stated, "[a] TMDL is the maximum amount of a pollutant that can be added to a waterbody (its "loading capacity") without exceeding water quality standards." Defs.' Opp'n at 1 (footnote omitted); *see also* 40 C.F.R. § 130.2(i).[2] Each TMDL must "be established at [a] level[ ] necessary to attain and maintain the applicable narrative and numerical [water quality standards,("WQS") ], with seasonal variations and a margin of safety [taking] into account any lack of knowledge concerning the relationship between effluent limitations[ [3]] and water quality." 40 C.F.R. § 130.7(c)(1).

Each state is required to submit to its EPA Regional Administrator its 303(d) list and the corresponding TMDLs for the bodies of water enumerated on the list. 33 U.S.C. § 1313(d)(2). The EPA is required to either approve or disapprove the bodies of water identified by the States and their corresponding TMDLs. *Id.* "If the [EPA] Administrator disapproves such identification[s] and load[s], he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the

---

**2.** Technically, a TMDL is "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). A load allocation ("LA") is that "portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." *Id.* § 130.2(g). Wasteload allocation ("WLA") is that "portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs

constitute a type of water-quality based effluent limitation." *Id.* § 130.2(h).

**3.** The term "effluent limitation" is defined as "any restriction established by a State or the Administrator [of the EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11). ·

water quality standards applicable to such waters . . . ." *Id.* Regardless of whether the EPA approves a State's 303(d) list and loads or establishes its own list and loads for the State, the CWA requires the state to incorporate this list and the designated loads into its current planning process ("CPP"). *Id.*

Unlike NPDES permits, TMDLS are not federally enforceable. Defs.' Opp'n at 11 (citation omitted). Rather, to encourage compliance, the EPA may "use federal grants to encourage the States to address nonpoint source pollution and accomplish the loading reductions established in a TMDL." *Id.* (citing 33 U.S.C. § 1288(f)). The EPA has authority, however, to institute a civil action against any polluter, whether from a point source or nonpoint source, "upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment" to human health or welfare. 33 U.S.C. § 1364; Defs.' Opp'n at 10 n. 7. On July 13, 2000, the EPA issued proposed regulations that would have revised the TMDL process. Defs.' Opp'n at 13. These regulations would have, *inter alia,* redefined a TMDL to include eleven elements, one being an implementation plan. *Id.* at 14 (citing 65 Fed.Reg. at 43,662). The revised regulations would also have required States to provide "reasonable assurances," which was defined as "a demonstration that TMDLs will be implemented through regulatory or voluntary actions[,]" as a part of the State's implementation plan. *Id.* On March 19, 2003, the EPA withdrew this proposed final rule, which never became effective, because the EPA "believe[d] that significant chances would need to be made to the July 2000 rule before it could represent a workable formula for an efficient and effective

TMDL program." 68 Fed.Reg. 13608 (Mar. 19, 2003). Thus, the relevant regulations related to the Act have remained unchanged since the inception of this lawsuit.

## B. Cordova Creek

Cordova Creek ("the Creek"), the body of water that is the subject of this litigation, is a high mountain stream located in north Central New Mexico. Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment ("Pl.'s Mem."), II. Factual Background: The Undisputed Facts ("Pl.'s Facts") ¶ 1, at 7. Prior to 1982, the Creek's water quality was "excellent[,]" and supported fish and other wildlife. *Id.* ¶¶ 3–4, at 7. However, in 1982, Rio Costilla, Incorporated, a private corporation, purchased 4,000 acres of land situated along the Creek's drainage and began developing a ski resort, called the Rio Costilla Ski Valley or "Ski Rio." *Id.* ¶ 5, at 7. Ski Rio's development activities, which included construction of access roads and parking lots, adversely impacted the water quality of the Creek as soon as the project commenced and by 1987 the development continued to degrade the Creek's water quality. *Id.* ¶ 7, at 7. The degradation of the Creek's water quality impelled concerned citizens to file a lawsuit to compel the EPA to take action to improve the Creek's water quality. *Id.* ¶¶ 15–16, at 8–9. The lawsuit, *Forest Guardians v. Browner,* Civil Action No. 96–0826, resulted in a Consent Decree and Settlement agreement which established a ten-year TMDL schedule with the State of New Mexico, and this schedule was later adopted by the New Mexico Environmental Department ("NMED") pursuant to a Memorandum of Understanding ("MOU") with the EPA. *Id.* ¶¶ 16–17, at 9.[4] TMDLs

---

4. Although maintaining that this fact is not material to the resolution of this lawsuit, defendants contend that plaintiff erroneously

characterizes the resolution. Rather, according to defendants, "[t]he Consent Decree and Settlement Agreement allow EPA until De-

were established for three pollutants that were impacting the Creek: turbidity, stream bottom deposits, and total phosphorous. Pl.'s Stmt. ¶ 20, at 9.

As required by Section 303(d) of the CWA, and in accordance with the deadline for the issuance of proposed TMDLs set forth in the *Forest Guardians'* consent decree, on November 10, 1999, the NMED submitted "the final TMDL . . . for Cordova Creek." Admin. R. at 14,[5] Letter to William Hathway, Water Quality Protection Division Director, USEPA Region 6, from James H. Davis, Chief, Surface Water Quality Bureau, NMED, dated November 10, 1999. The NMED's submission, entitled "Total Maximum Daily Load for Turbidity, Stream Bottom Deposits and Total Phosphorus for Cordova Creek," was submitted to the EPA for its "review, approval, and update into work element six of the New Mexico Water Quality Management Plan" ("NMED's Final TMDL") *Id.* Contained within this final TMDL document was a section entitled "Implementation Plan," which contained the State's proposed method by which it hoped to attain the proposed TMDL limits for the three identified pollutants. This section of the final TMDL acknowledged that "[n]onpoint source water quality improvement work utilizes a voluntary approach[,]" and stated that the State's plan would include the use of "technical support and grant money for implementation of best management practices. . . ." Admin. R. at 31, NMED's Final TMDL. In accordance with this acknowledgment, the NMED indicated that "[a] combination of best management practices [BMPs] [would] be used to implement this TMDL[,]" and the State's

Surface Water Quality Bureau ("SWQB") would "work with the [NMSHD] and private landowners in implementing BMPs throughout the watershed." *Id.* at 30.

In a letter dated December 17, 1999, the director of the Water Quality Protection Division of the EPA stated that the agency had reviewed the State's submission and was "pleased to approve the Cordova Creek TMDLs for turbidity, stream bottom deposits, and total phosphorous as updates to work element six of the New Mexico Water Quality Management Plan." Admin. R. at 1, Letter to James H. Davis, Chief, SWQB, NMED, from William B. Hathway, Director, Water Quality Protection Division, dated December 17, 1999. The EPA stated that "based on [its] review" of the State's submission, it had "conclude[d] that the TMDLs [for turbidity, stream bottom deposits, and total phosphorous] [met] the requirements found in Section 303 of the Clean Water Act and the implementing regulations at 40 CFR 130.7." *Id.* Enclosed with the EPA's letter was a document entitled "Review Elements of TMDLs." ("Review"). *Id.* at 3. This EPA document contained a section entitled "Implementation Plans," wherein the EPA stated that "[a]lthough implementation plans are not approved by EPA, they help establish the basis for EPA's approval of TMDLs." *Id.* at 9. The EPA Review commented that the NMED had included a "generic" implementation plan section within its TMDL. *Id.* Furthermore, the EPA indicated that although "EPA guidance calls for reasonable assurances when TMDLs are developed for waters impaired by both point and nonpoint

cember 31, 2016, to ensure completion of any necessary TMDLs for the water quality limited segments on New Mexico's 1996 Section 303(d) list." Defendants' Statement Controverting Plaintiff's Statement of Undisputed Material Facts ("Defs.' Stmt.") ¶ 16.

5. References to "Admin. R." are to the Administrative Record filed by the defendants. Page citations reference the page numbers that have been stamped on the documents by the defendants.

sources[,]" for waters such as the Creek that are

> impaired solely by nonpoint sources, reasonable assurances that load reductions will be achieved are not required in order for a TMDL to be approvable. However, for such nonpoint source—only waters, States/Tribes are strongly encouraged to provide reasonable assurances regarding achievement of load allocations in the implementation plans. . . . [S]uch reasonable assurances should be included in State/Tribe implementation plans and may be nonregulatory, regulatory, or incentive-based, consistent with applicable laws and programs.

*Id.* at 10. The EPA did not comment on the substance of the State's implementation plan or whether it believed that the TMDL levels would be attained through the use of this plan.

## II. The Parties' Arguments

According to plaintiff, there are two issues that are presented for the Court's resolution in this case. The first is whether the EPA, "when approving a TMDL and/or a plan to implement a TMDL," must require that a state provide " 'reasonable assurances' . . . that the TMDL will be implemented to improve water quality[.]" Pl.'s Mem. at 2.[6] The second issue in this case, according to plaintiff, is whether the State of New Mexico's implementation plan for the Creek TMDLs, which consists of "a 'purely voluntary' plan of implementation, provide[s] these 'reasonable assurances[.]' " *Id.* Plaintiff argues that the text of the CWA, its legislative history, and the EPA's own prior guidance documents, establish that voluntary compliance plans do not provide the requisite reasonable assurances that a

TMDL will be implemented. *Id.* at 15, 21. Accordingly, plaintiff posits that the "EPA's decision to approve [the Creek's voluntary] plan is therefore 'arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.' " *Id.* at 3 (quoting 5 U.S.C. § 706(2)(A)).

The defendants advance several arguments in support of their position that the Court should grant their cross-motion for summary judgment. The defendants first argue that this Court is without subject matter jurisdiction over this dispute because the "EPA has taken no agency action with respect to the Cordova Creek implementation plan. . . ." Defs.' Opp'n" at 1. Rather, according to defendants, the EPA merely approved the State's TMDLs for turbidity, stream bottom deposits, and total phosphorus; it did not, however, as alleged by plaintiff, approve the method by which these TMDLs would be achieved. *Id.* Second, defendants assert that plaintiff does not have standing to maintain this action "because they have failed to demonstrate that they have suffered a concrete and immediate injury as the result of EPA's alleged approval of the Cordova Creek implementation plan." *Id.* at 2. Third, assuming the Court concludes it has jurisdiction, defendants argue that there is no statutory requirement contained in the CWA that requires that there must be reasonable assurances that a TMDL is achieved. *Id.* Therefore, defendants opine that even if the Court concludes that they approved the State's implementation plan, such approval was reasonable. *Id.*

## III. Analysis

As indicated, defendants first argue that this Court lacks subject matter jurisdiction over plaintiff's challenge because the EPA never approved the State's implementation plan. Rather, according to defendants,

---

**6.** Plaintiff does not challenge the EPA's approval of the State's TMDLs. As demonstrated in their complaint, they challenge the EPA's alleged approval of the State's implementation plan through which it hopes to attain the TMDL levels it established.

"[t]he only final agency action EPA has taken relevant to Cordova Creek is that ... it 'approve[d] the Cordova Creek TMDLs for turbidity, stream bottom deposits, and total phosphorus' because they were consistent with the statutory and regulatory requirements for a TMDL." Defs.' Opp'n at 20 (quoting Admin. R. at 1). Plaintiff contends, on the other hand, that the "EPA clearly approved the implementation plan section of the TMDLs for Cordova Creek and approves implementation plans for TMDLs all the time." Pl.'s. Reply at 4. Although conceding that "plans to implement TMDLs may not necessarily be a 'required' element of a TMDL ... [,]" plaintiff asserts that they "nonetheless [must] be approved by EPA." *Id.* at 5.

Both plaintiff and defendants agree that this case is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2000). Pursuant to the APA, "agency action" is defined as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act...." 5 U.S.C. § 551(13). Clearly, the defendants approved the State's TMDL levels for turbidity, stream deposits, and total phosphorous. Admin. R. at 1. In its explanation to the State regarding why it was approving the State's TMDLs, the EPA explicitly stated that "[a]lthough implementation plans are not approved by EPA, they help to establish the basis for the EPA's approval of TMDLs." *Id.* at 9. Nowhere in the document does the EPA state that it is endorsing the State's implementation plan; rather, the EPA's "[c]omment" on the plan merely notes that the State's TMDL included a "generic implementation plan [that] outline[d] strategies to be used in implementing this TMDL." *Id.*

▇ Pursuant to the APA, this Court is only permitted to review " 'final agency action' for which there is no other adequate remedy in a court." *Transport Rob-*

*ert (1973) LTEE v. United States Immigration & Naturalization Service,* 940 F.Supp. 338, 340 (D.D.C.1996) (quoting 5 U.S.C. § 704). The "final agency action" requirement "recognizes that courts must not interfere with the executive function, whether exercised by executive officials or administrative agencies, by entertaining a lawsuit that challenges an action that is not final." *Id.* (citing *Nat'l Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689, 698 (D.C.Cir.1971)). In this regard, the finality requirement is similar to the constitutional doctrine of ripeness. As stated by the District of Columbia Circuit, "[t]he degree of finality of agency action is the key consideration in evaluating its 'fitness for judicial review' under the ripeness doctrine." *Id.* (citing *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 435–36 (D.C.Cir.1986)).

▇ To be final, agency action must meet two conditions. "First, the action must mark the 'consummation' of the agency's decision-making process, ... it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow....' " *Barrick Goldstrike Mines, Inc. v. Browner,* 215 F.3d 45, 48 (D.C.Cir.2000) (citations omitted). In determining whether agency action is final for purposes of judicial review, the Court must "look primarily to whether the agency's position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties challenging the action." *Ciba Geigy Corp.,* 801 F.2d at 435–36 (citations omitted). In line with this reasoning, the Circuit Court for this District has held that "a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action' for the purpose of judicial review." *Barrick,* 215 F.3d at 48.

■ The action challenged here is not the EPA's approval of the TMDL limits, but rather, the agency's alleged approval of the State's implementation plan, which plaintiff infers occurred because the EPA approved the final TMDL limits. Pl.'s Mem. at 35. However, the agency's letter, which is the purported final agency action plaintiff points to, does not make any definitive findings regarding the State's implementation plan; the letter merely comments that the implementation plan was included with the State's submission and termed the plan "generic." Admin. R. at 9. This corresponds with the defendants' position because the EPA's approval of a State's TMDL does not translate into approval of the State's implementation plan. As another Circuit Court recognized, "[t]he two are different.... A TMDL is defined to be a set measure or prescribed maximum quantity of a particular pollutant in a waterbody, ... while an implementation plan is a formal statement of how the level of that pollutant can and will be brought down to or be kept under the TMDL." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1030 (11th Cir.2002) (citation and footnote omitted). Although the Court's research has failed to unveil a case directly analogous to the present case, the resolution of the events presented to the Court in *City of Arcadia v. EPA*, 265 F.Supp.2d 1142 (N.D.Cal.2003), provide support for the Court's conclusion here.

■ In *City of Arcadia*, several Californian cities brought suit against the EPA and its administrators alleging that the defendants had violated, *inter alia*, the CWA. Relevant to the present suit was the plaintiffs' challenge in *City of Arcadia* to what the Court termed the "*de facto* TMDL procedure," which entailed the establishment of the relevant TMDL by the State Regional Board and "the preparation and notice of the TMDL by the [EPA]."

*Id.* at 1153. The defendants argued that "what [p]laintiffs characterize[d] as a *de facto* TMDL procedure [was] not an 'agency action,' much less a final agency action, but in fact a sequence of events; as such, they maintain[ed], the procedure [could not] give rise to a challenge under the APA...." *Id.* at 1153–54. In agreeing with the defendants that it lacked subject matter jurisdiction to consider the plaintiffs' challenge, the Court concluded that it was "apparent that the alleged *de facto* TMDL procedure ... is not subject to challenge under the APA ... because it is not final agency action within the meaning of [the] statute[ ]." *Id.* at 1154. Notably, the Court agreed with defendants that "[p]laintiffs' assertion that the TMDL procedure *consummated in* final agency action, namely the EPA's approval of the State Trash TMDLs, is an implicit admission that the 'procedure' itself is not final agency action." *Id.* Plaintiff here, in a similar fashion, does not challenge the EPA's final action, *i.e.*, the approval of the TMDL limits, but the procedure employed by the EPA to reach its final decision to approve the State's TMDLs, which included the review, but not the approval, of the State's implementation plan. This review did not constitute final agency action, as it did not amount to an approval of the State's implementation plan.

In a case less analogous than *City of Arcadia*, but of some assistance to the Court, the Supreme Court held that a wildlife group's challenge to the Bureau of Land Management's ("BLM") "land withdrawal review program" had to be dismissed because, among other deficiencies, the program did not constitute agency action or final agency action within the meaning of the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The agency program at issue there was not the product of an administrative rule or regulation, but involved the BLM's review and recom-

mendation process regarding the management of public lands under the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.,* ("FLPMA"), which "established a policy in favor of retaining public lands for multiple use management." *Id.* at 877. The National Wildlife Federation argued that the Department of Interior's "reclassification of some withdrawn lands and the return of others to the public domain would open the lands up to mining activities, thereby destroying their natural beauty." *Id.* at 879, 110 S.Ct. 3177. It argued further that the agency had failed to revise land use plans, submit recommendations for withdrawals of land to the President, "fail[ed] to consider multiple uses for the disputed lands," inappropriately focused on "mineral exploitation and development," and failed "to provide public notice of decisions." *Id.* The Supreme Court held that the challenged land review program was "not an 'agency action' within the meaning of [5 U.S.C.] § 702, much less a 'final agency action' within the meaning of § 704." *Id.* at 890, 110 S.Ct. 3177. The Court stated that

> [t]he term land withdrawal review program (which as far as [the Court could discern was] not derived from any authoritative text) [did] not refer to a single BLM order or regulation, or even to a complete universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA. It is no more an identifiable 'agency action'— much less a 'final agency action'—than a 'weapons procurement program' of the

Department of Defense or a drug interdiction program of the Drug Enforcement Administration.

*Id.* Thus, the Court held that plaintiff's challenge to the agency's decision-making process, which it termed the land review program, was not final agency action in and of itself. *Id.* at 890 n. 2, 110 S.Ct. 3177 ("[W]e do not contend that no 'land withdrawal review program' exists.... We merely assert that it is not an identifiable 'final agency action' for purposes of the APA.").

Here, plaintiff makes even a less compelling argument for finding final agency action than did the organization in *Lujan.* Plaintiff concedes that "plans to implement TMDLs may not necessarily be a 'required' element of a TMDL...." Pl.'s Reply at 5. Furthermore, there is no statutory language requiring submission to or approval of a State's implementation plan by the EPA; rather, the statute only requires that the EPA approve or disapprove a State's TMDL. 33 U.S.C. § 1313(d)(2). Nonetheless, plaintiff contends that the EPA "approves implementation plans for TMDLs all the time." Pl.'s. Reply at 4. However, even assuming the truth of this assertion, plaintiff fails to demonstrate how what the EPA does "all the time" translates into making what occurred in this case final agency action. Accordingly, plaintiff's reference to the fact that the "EPA entered into a Memorandum of Agreement with the State of Oregon Department of Environmental Quality ... regarding the implementation of TMDLs in the State of Oregon[,]" has no significance to the Court's conclusion that there was no final agency action in this case.[7] Nor does reference to prior EPA guidance documents, which do not "have the effect of law." *Sierra Club,* 296

---

7. In its reply, plaintiff relies on the district court's decision in *Sierra Club v. Hankinson,* No. 94–2501, slip op. at 3–4 (N.D.Ga. July 24,

2001), wherein the Court held that pursuant to the terms of a consent decree entered into by the EPA and the State of Georgia, imple-

**58**

F.3d at 1033. What the Court must assess in determining whether there was final agency action is the actual correspondence issued by the EPA, which approved the TMDL limits established by the State. The EPA's correspondence in no way either approved or disapproved the State's implementation plan. Thus, there was no final agency action concerning the implementation plan and this Court is without jurisdiction pursuant to the APA to review plaintiff's challenge. Plaintiff's complaint is therefore dismissed.

**SO ORDERED** on this 3rd day of March, 2004.[8]

### *ORDER*

In accordance with the Court's Memorandum Opinion that is being issued contemporaneously with the issuance of this Order, it is hereby

**ORDERED** that plaintiff's motion for summary judgment [# 15] is denied. It is further

**ORDERED** that defendants' cross-motion for summary judgment [# 20] is granted. It is further

**ORDERED** that this action is dismissed.

mentation plans had to be established. The Court also rejected the EPA's argument that the CWA did not require the submission of implementation plans, stating that the "EPA's interpretation is incompatible with the Clean Water [A]ct['s] goal of improving water quality." *Id.* at 4. On July 3, 2002, defendants filed a Notice of Supplemental Authority in which they indicated that the district court's decision in *Sierra Club* had been reversed by the Eleventh Circuit. *See Sierra Club v. Meiburg*, 296 F.3d 1021 (11th Cir.2002). Specifically the Eleventh Circuit reversed the district court's conclusion that the consent decree required the EPA to establish implementation

plans for the State of Georgia because the consent "decree defined a TMDL as having the meaning provided at Section 303(d)(1)(C) of the CWA ... and 40 C.F.R. § 130.2(i) ... [n]either [of which] includes implementation plans within the meaning of TMDLs." *Id.* at 1029–30. The Eleventh Circuit held that the district court abused its discretion by "grafting onto the [consent] decree a substantial modification that was not part of the original bargain between the parties." *Id.* at 1024.

8. An Order consistent with the Court's ruling is being issued contemporaneously with the issuance of this Memorandum Opinion.