832 So.2d 61 (2002)
Ex parte LEGAL ENVIRONMENTAL ASSISTANCE FOUNDATION, INC.
(In re Legal Environmental Assistance Foundation, Inc. v. Alabama Department of Environmental Management et al.).
1000563.
Supreme Court of Alabama.
March 1, 2002.
*62 David A. Ludder, Tallahassee, Florida, for petitioner.
James L. Wright and Harry A. Lyles, Department of Environmental Management, for respondents.
JOHNSTONE, Justice.
Legal Environmental Assistance Foundation, Inc. ("LEAF"), petitioned this Court for certiorari review of the no-opinion order of affirmance by the Court of Civil Appeals of a summary judgment entered by the trial court in favor of the Alabama Department of Environmental Management ("ADEM"). Legal Envtl. Assistance Found., Inc. v. Alabama Dep't of Envtl. Mgmt., (No. 2990902, December 15, 2000), 822 So.2d 490 (Ala.Civ.App.2000) (table). We granted the petition to determine whether the trial court erred in grounding the summary judgment on the premise that certain procedures promulgated by ADEM were not "rules" within the meaning of the Alabama statutes governing the promulgation of "rules" by administrative agencies in general and by ADEM in particular. The procedures promulgated by ADEM regulate the discharge of pollutants into Alabama waterways.
LEAF sued ADEM on the theory that the Implementation Procedures for Tier 2 of the Antidegradation Policy ("Implementation Procedures"), Ala. Admin. Code (ADEM) Rule 335-6-10-.04(03), constitute "rules" as defined in § 41-22-3(9), Ala.Code 1975, of the Alabama Administrative Procedure Act ("AAPA") and that ADEM did not fulfill the requirements of the AAPA or of the Alabama Environmental Management Act ("AEMA") for promulgating new rules. Relying on Alabama Department of Transportation v. Blue Ridge Sand & Gravel, Inc., 718 So.2d *63 27 (Ala.1998), ADEM moved for a summary judgment, which LEAF opposed. Likewise relying on Blue Ridge, the trial court entered the summary judgment in favor of ADEM. LEAF appealed to the Court of Civil Appeals, which affirmed without an opinion. Legal Envtl. Assistance Found., Inc., supra.
LEAF raises two issues. The first is whether the Implementation Procedures are "rules" as defined in § 41-22-3(9), Ala. Code 1975, which ADEM could not legally adopt without complying with the rulemaking provisions of the AAPA and the rulemaking provisions of the AEMA in § 22-22A-8, Ala.Code 1975. The second issue is whether the EPA required the adoption of the particular forms and procedures in the Implementation Procedures and thereby constituted the Implementation Procedures an exception to the definition of "rules," as explained by this Court in Blue Ridge. Because we hold the Implementation Procedures are "rules" and are not an exception to the definition of "rules," we reverse the affirmance of the summary judgment and remand this cause.
The Federal Antidegradation Policy, 40 C.F.R. § 131.12, requires a state to "develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy." The Federal Antidegradation Policy specifies that statewide "policy and implementation methods shall, at a minimum, be consistent with the following": (1) protect existing uses of "instream water" and protect the level of water quality necessary to protect the existing uses; (2) maintain and protect "the quality of waters exceed[ing] levels necessary to support propagation of fish, shellfish, and wildlife" unless a state finds that lower water quality is necessary, but, in any event, the state must assure "water quality adequate to protect existing uses fully"; (3) assure that water quality and uses are not lowered below the existing statutory and regulatory requirements; and (4) maintain and protect high-quality waters where those waters constitute "an outstanding National resource." 40 C.F.R. § 131.12 (emphasis added).
ADEM revised its statewide "antidegradation policy," Ala. Admin.Code (ADEM) Rule 335-6-10-.04, effective April 3, 1991, in response to the mandates of the Federal Antidegradation Policy. However, the amended statewide antidegradation policy adopted by ADEM did not contain any methods or procedures for implementing the policy.
In 1995, LEAF complained to the EPA that ADEM had not adopted any methods or procedures to implement the revised antidegradation policy. In April 1997, the EPA regional administrator for Region IV in Atlanta informed ADEM by letter that he was "considering a recommendation" to the EPA administrator in Washington that "a federal promulgation is necessary to bring the statewide antidegradation policy into compliance with the requirements of the Clean Water Act." He asked ADEM "to take appropriate actions." The EPA regional administrator informed ADEM that if, within 90 days of its receipt of the letter, ADEM did not submit procedures to implement the statewide antidegradation policy, then he would recommend that the EPA administrator in Washington "prepare and publish proposed federal regulations setting forth a revised statewide antidegradation policy."
Shortly thereafter, ADEM developed and adopted the Implementation Procedures now at issue before us, which allow the maximum pollution allowable under the Federal Antidegradation Policy and which establish the criteria to be met, and the procedures to be followed to demonstrate that those criteria have been met, by applicants for permits to discharge pollutants *64 into Alabama waterways. The Implementation Procedures contain an intermingling of forms and procedures. On August 25, 1999, the EPA regional administrator for Region IV approved the Implementation Procedures.
In adopting the Implementation Procedures allowing the pollution and establishing the criteria and procedures for permission to discharge, ADEM did not afford the public notice or opportunity to be heard or otherwise follow the requirements of the AAPA or the AEMA for the promulgation of "rules." Therefore, LEAF filed its civil action for declaratory and injunctive relief against ADEM. LEAF sought to enforce the rulemaking provisions of §§ 41-22-4, -5, and -23, and §§ 22-22A-8(a) and (b), Ala.Code 1975.
ADEM does not contend that it complied with the rulemaking requirements. Rather, ADEM contends that no such compliance was necessary because, ADEM further contends, the Implementation Procedures are not "rules" as defined in the AAPA or as governed by its requirements or the AEMA requirements for public notice, opportunity to be heard, and other safeguards.
The pertinent part of § 41-22-3(9) defines a "rule" as:
"Rule. Each agency regulation, standard, or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule or by federal statute or by federal rule or regulation ...." (Emphasis added.)
Blue Ridge, supra, is distinguishable from the case now before us. In Blue Ridge, the Federal Highway Administration had issued a directive requiring "a bulk specific gravity greater than 2.550" for gravel used in hot-mix asphalt for roads and in the superstructures of bridges in federally funded highway projects in Alabama. 718 So.2d at 28. To comply with this federal requirement and thereby to obtain federal funding, the Alabama Department of Transportation ("ALDOT") amended its highway construction specifications to include this federal specification for the specific gravity of the gravel. The Blue Ridge plaintiffs sued ALDOT on the theory that this change in gravel specifications constituted a "rule" governed by the AAPA, which ALDOT had not followed in adopting the change. Holding that this change in gravel specifications did not constitute a "rule" that would require compliance with the AAPA, the Blue Ridge Court explained:
"The question is whether the standard specifications are `rules' within the meaning of § 41-22-3(9), Ala.Code 1975. [ALDOT] argues that they are not, but that they are only, as they purport to be, specifications for engineering details and materials that may be incorporated by reference into a request for bids for highway construction contracts. Section 41-22-3(9) defines `Rule' as `Each agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency....'
"The standard specifications do not `describe[] the organization, procedure, or practice requirements of' [ALDOT]. Pursuant to the AAPA, [ALDOT] has adopted administrative rules that describe its organization, procedure, and practice requirements. See Alabama Administrative Code, Chapter 450-1-1 et seq.

*65 "Nor do the standard specifications constitute an `agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy.'Rather, each of the specifications, including the amended specifications directly at issue here, is simply a term that may be incorporated into a contract between [ALDOT] and some other party. See generally § 41-16-27, Ala.Code 1975, which provides that, in accepting or rejecting competitive bids, an awarding authority may take into consideration `the qualities of the commodities proposed to be supplied, their conformity with specifications, the purposes for which required,' and so forth. Ala.Code 1975, § 41-16-27(a) (emphasis added [in Blue Ridge]). If an unsuccessful bidder or another interested party considers specifications for a given contract to be inappropriate, the competitive bid law provides a means for challenging the inclusion of those specifications. See § 41-16-31; White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971). The fact that [ALDOT] has established standard specifications that it may incorporate by reference rather than setting forth all specifications in each highway construction contract does not elevate those specifications to the status of `rules.' All interested parties seriously involved in highway contracting and supplying materials know of these standard specifications, because [ALDOT] makes them available to the public. See § 23-1-34; Chapter 450-1-1-.09 and 450-1-2-.06, Ala. Admin. Code.
"....
"... [S]uch standard specifications are not `rules' within the purview of the [AAPA].
"Moreover, even if the Department of Transportation's Standard Specifications for Highway Construction might be considered `rules,' the evidence presented to the circuit court brings the amended and supplemental specifications within one or more exceptions to the AAPA's definition of `Rule.' The definition in § 41-22-3(9) of `Rule' states that a rule, for purposes of the AAPA, `includes any form which imposes any requirement or solicits any information not specifically required ... by an existing rule or by federal statute or by federal rule or regulation.' [ALDOT] introduced evidence indicating that the adoption of the 2.550 specific-gravity requirement was required for the state to continue to receive federal highway money....
"`....'
"By the terms of § 41-22-3(9), the standard incorporated into § 801.01(a) and the other amended and supplemental specifications is not a `rule' governed by the AAPA, because it is `specifically required... by federal rule or regulation.'
"In the chapters of the Code governing the operation of [ALDOT], there are many instances where [ALDOT] is given the authority to make agreements with, or otherwise to cooperate with, the Federal Government so as to facilitate the receipt of federal money for the construction of highways and bridges and for other reasons. See, e.g., § 23-1-1, authorizing [ALDOT] to `enter into all necessary contracts and agreements with the United States government or any agency or officer thereof ... and to do all other things necessary to secure to the state and its counties and municipalities the full benefits provided by [Congressional] acts'; § 23-1-57(4), regarding compliance with federal regulations when [ALDOT] enters an agreement regarding the construction of a bridge across a river forming a state boundary; § 23-1-170 et seq., especially *66 -175(13), regarding the Alabama Finance Corporation; and § 23-1-300 et seq., creating the Federal Aid Highway Finance Authority. If [ALDOT] were required to implement rulemaking procedures each time the Federal Government changed its requirement for some aspect of road-building, the attendant delays, expense, and use of the time of [ALDOT] employees could completely strangle the entire process of highway construction in this state. This shows that the exception in § 41-22-3(9) for requirements imposed by federal rule or regulation is a reasonable exception to the definition of `Rule'; this further supports our conclusion that the injunction is due to be dissolved."
718 So.2d at 29-31 (footnotes omitted; some emphasis omitted; some emphasis added).
In the case now before us, the EPA, pursuant to the Federal Antidegradation Policy, required ADEM to adopt a statewide antidegradation policy and methods and procedures for implementing the policy. While the Federal Antidegradation Policy does impose minimum requirements or, stated another way, maximum pollution levels, the federal policy does not, and the EPA did not, mandate specific policies, forms, methods, or procedures that Alabama must adopt. The Federal Antidegradation Policy does not require that Alabama allow any pollution at all. Rather, this federal policy requires that, if Alabama will allow pollution, Alabama must restrict it to levels no worse than those allowed by 40 C.F.R. § 131.12 (already summarized in this opinion), must decide and promulgate the levels that Alabama will allow within the federal parameters, and must establish the criteria for discharge permits and the procedures for seeking and granting those permits.
Likewise, the April 1997 letter from the EPA regional administrator to ADEM did not require ADEM to adopt the specific procedures, forms, or economic analyses of the benefits of pollution contained in the Implementation Procedures issued by ADEM. The EPA regional administrator merely required ADEM to adopt implementation methods and procedures for the statewide antidegradation policy within the federal parameters.
The features of the case before us that distinguish it from Blue Ridge, supra, are twofold. First, the Implementation Procedures promulgated by ADEM do, within the § 41-22-3(9) definition of "rule," constitute a "regulation ... or statement of general applicability that implements ... or prescribes law or policy, or that describes the ... procedure[] or practice requirements of any agency...." The Implementation Procedures implement the state antidegradation policy, prescribe pollution policy for the state of Alabama, and describe the procedure and practice requirements of ADEM for applications for discharge permits. Second, the Implementation Procedures do not fit the exception to the § 41-22-3(9) definition of "rule." That is, the particular Implementation Procedures are not "specifically required by statute or by an existing rule or by federal statute or by federal rule or regulation." Therefore, the Implementation Procedures are "rules" within the AAPA definition, and Blue Ridge is not authority to the contrary.
Further, the statement in the EPA regional administrator's letter that, unless ADEM adopted procedures to implement the state antidegradation policy, the EPA would "publish proposed federal regulations setting forth a revised statewide antidegradation policy" (emphasis added), is persuasive that the Implementation Procedures are "rules" that required ADEM to *67 comply with the rulemaking provisions of the AAPA and the AEMA, §§ 41-22-1 to -27, specifically §§ 41-22-4, -5, and -23, and §§ 22-22A-8(a) and (b). The administrator was saying that, unless ADEM adopted the necessary procedures, the EPA would need to institute the public notice and opportunity to be heard necessary for federal rulemaking pursuant to the federal statutory scheme for rulemaking, which is similar to the AAPA and the AEMA. 5 U.S.C. § 553.
Because the Implementation Procedures are "rules" within the meaning of § 41-22-3(9), the AAPA and the AEMA required ADEM to comply with the rulemaking provisions embodied by §§ 41-22-1 to -27, specifically §§ 41-22-4, -5, and -23, and §§ 22-22A-8(a) and (b), Ala.Code 1975. The summary judgment grounded on the mistaken premise that the Implementation Procedures are not "rules" is invalid. Therefore, we reverse the judgment of the Court of Civil Appeals and remand this case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs specially.
HOUSTON, J., dissents.
MOORE, Chief Justice (concurring specially.).
I fully join the opinion of the Court. I write separately to explain what I believe are fundamental problems illustrated by a case such as this one.
The procedural issues presented in this case are inherent in the nature of agency regulation. In this case, we find fault with the failure of the Alabama Department of Environmental Management ("ADEM") to comply with the requirements of the Alabama Administrative Procedure Act ("AAPA"). Like its federal counterpart, the AAPA exists to bring a level of legitimacy to what is an inherently illegitimate exercise of power in our constitutional system.
In essence, the AAPA requires administrative agencies to give public notice and an opportunity for public comment on proposed regulations before those regulations can take effect. "The Alabama Administrative Procedure Act was adopted in 1981 as `a minimum procedural code for the operation of all state agencies when they take action affecting the rights and duties of the public.' § 41-22-2(a). It was based in part upon the Revised Model State Administrative Procedure Act (1961)." Alabama Cellular Serv., Inc. v. Sizemore, 565 So.2d 199, 202 (Ala.1990). The purposes of the AAPA, can be found in § 41-22-2(b), Ala.Code 1975, and include "provid[ing] legislative oversight of powers and duties delegated to administrative agencies" and "increas[ing] public accountability of administrative agencies." These are laudable goals, given the current paradigm of administrative agencies and the powers they possess, and it is for these reasons that I concur with the opinion of the Court.
However, in reality, the AAPA merely serves as a band-aid stretching over a vast laceration in our constitutional system. Agencies, in their present form, are that laceration and have aptly been described as the "fourth branch of government." Federal Election Comm'n v. NRA Political Victory Fund, 778 F.Supp. 62, 66 (D.D.C.1991).
"Historically and traditionally the Constitutions of all the states and of the United States have separated the powers of government into three branches, the legislative, the executive, and the judicial. Section 42 of our Constitution of 1901, and its precursors in our previous *68 constitutions, is but a reflection of this settled principle."
Morgan County Comm'n v. Powell, 292 Ala. 300, 306, 293 So.2d 830, 834 (1974). "The state government is divided into three co-ordinate branches, legislative, judicial, and executive; each has a sphere of action, and within that sphere each is, and must be regarded, as supreme. Powers confided to one cannot be exercised by the others." State ex rel. French v. Stone, 224 Ala. 234, 236, 139 So. 328, 329 (1932).
Inherent in the constitutional establishment of threeand only threedistinct branches of government is the concept of the nondelegation of power. "It is settled law that the Legislature may not constitutionally delegate its powers, whether the general power to make law or the powers encompassed within that general power...." Folsom v. Wynn, 631 So.2d 890, 894 (Ala.1993). The principle of the nondelegation of powers prevents the exercise of unauthorized power, the exercise of which is contrary to the established nature of a republic.
Under this principle, Congress and the state legislatures cannot delegate their lawmaking power, because that power ultimately does not belong to them; thus it is not theirs to delegate. These legislative bodies derive their power to pass laws from the people's consent to submit to the legislature's promulgation of those laws. "Governments ... deriv[e] their just Powers from the Consent of the Governed...." Declaration of Independence para. 2 (U.S.1976).
Through the United States Constitution and their state constitutions, the people have granted to the three branches of government certain limited powers, with the understanding that those branches are in some measure controlled by the people. For the legislature to delegate its lawmaking powers to unelected bodies such as administrative agencies is to distort, and perhaps even destroy, that understanding that exists between the government and the people; it is as unacceptable as the judiciary's usurping the legislature's lawmaking power. Indeed, having an unelected, unaccountable body making and enforcing the laws is the very definition of tyranny.
This principle of nondelegation has been compromised by the establishment of administrative agencies. The first of these agencies was the Interstate Commerce Commission, created by Congress in 1887. However, agencies did not establish a permanent place in our system of government until the passage of New Deal legislation during Franklin D. Roosevelt's presidency. See George B. Shepherd, Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics, 90 Nw. U.L.Rev. 1557 (1996). Congress established agencies out of a desire to ease the suffering caused by the Great Depression, another laudable goal, but the price for good intention was a diminishing of legislative, and by implication, the people's, power.
Before this boom in administrative agencies, regulation was effected primarily through the enforcement of the laws by the existing apparatus of the executive branch; the statutes were interpreted primarily by the courts. See Elihu Root, "Public Service by the Bar," Address Before the American Bar Association, in 41 A.B.A.R. 355, 368-69 (1916). The change in circumstances brought on by the Great Depression seemingly necessitated a change in the method of making laws and was used by federal bureaucrats as an occasion to expand their power. "The focus [in lawmaking] changed from enabling organized action to injecting more public management or supervision of affairs and providing more sustained, specialized *69 means of defining and enforcing public policy." I Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 1.4 at 8 (3d ed.1994), quoting James W. Hurst, Hurst's Law and Social Order in the United States 36 (1977).
The result of this change at the federal level alone has been enormous. "Federal agencies adjudicate far more disputes involving individual rights than do the federal courts. They create more binding rules of conduct than Congress. Agencies also `administer' in the broadest sense of that word. They investigate, enforce, cajole, publicize, spend, hire, fire, contract, collect information, and disseminate information." Davis & Pierce, § 1.1 at 2.
Courts accommodated the change in the landscape wrought by the creation of these lawmaking agencies by carving out an exception to the principle of nondelegation. "So long as [the legislature] `shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." Mistretta v. United States, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)(quoting J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928))(second alteration in Mistretta). This is known as the "intelligible-principle" exception to the principle of nondelegation.
In theory, requiring an "intelligible principle" before the authority to execute and administer the law could be delegated sounds reasonable; in practice, however, it proves to be the equivalent of giving administrative agencies a blank check. Under this exception, the United States Supreme Court on several occasions has upheld extremely broad delegations of power. See, e.g., Mistretta v. United States, supra (upholding Congress's statutory delegation of broad power to the Federal Sentencing Commission to issue binding guidelines for sentencing of all persons convicted of federal crimes); Skinner v. Mid-America Pipeline Co., 490 U.S. 212, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989)(upholding the delegation to the Secretary of Transportation of the authority to calculate and impose a tax on all persons operating pipelines); Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 473, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001)(upholding the delegation to the EPA of the authority to set national ambient air quality standards under the Clean Air Act at levels "requisite to protect public health"). The effect of these holdings is to impose virtually no limits on what responsibilities Congress may delegate to an administrative agency.
In a sense, whenever a legislative body enacts a law, it delegates power to the executive branch to execute that command. "[A] certain degree of discretion, and thus of lawmaking, inheres in most executive or judicial action." Mistretta, 488 U.S. at 417, 109 S.Ct. 647 (Scalia, J., dissenting). However, the legislature does not give up any power in this type of delegation, because it has no power to execute the laws it enacts; both the United States Constitution and state constitutions assign the responsibility of enforcing the laws to the executive branch.
The delegation of power to agencies, however, encompasses a completely different type of delegation. It involves giving agencies the powers possessed by the existing branches of government. Indeed, the three main functions of an agency are rulemaking, enforcement of its rules and regulations, and adjudication of disputes that flow from the violations of its rules and regulations. These are functions traditionally held by the three branches of government. "Agencies are saturated with mixtures *70 of legislative, executive, and judicial powers." Davis & Pierce, supra, § 2.3 at 38.
Rulemaking by agencies is a prime example. "[S]cores of agencies exercise legislative power routinely by promulgating what are candidly called `legislative rules.'" Davis & Pierce, supra, § 2.3 at 37. "Legislative rules," which are enforceable after public notice and an opportunity for public comment, "have the same binding effect as statutes." Davis & Pierce, supra, § 6.1 at 225. Thus, administrative regulations are simply laws by another name. This Court has previously admitted as much. "Administrative agencies are often given power to make rules and regulations which in effect are delegations of the legislative power of the state...." Bailey v. Shelby County, 507 So.2d 438, 442 (Ala. 1987).
In a very real sense, then, agencies have become a "fourth branch of government," something that is, as some courts have put it, "`contrary to the genius of republican government.'" Civil Service Comm'n v. Auditor General, 302 Mich. 673, 5 N.W.2d 536 (1942), quoting Colbert v. State, 86 Miss. 769, 39 So. 65 (1905). Permitting agencies to enact what are, in effect if not in name, laws, defeats the basic principles of a republican form of government.
"One writer has said that there are four essential characteristics of a republican form of government.
"1) The existence of the ultimate sovereignty in the body politic;
"2) The expression of the popular will by the method of representation;
"3) Subservience of the entire group to the will of the majority; and
"4) The independency of the executive, legislative, and judicial departments of government. Ingham, Republic in Form, 34 Dickinson L.Rev. 193 (1930)."
Board of Comm'rs of the Alabama State Bar v. State ex rel. Baxley, 295 Ala. 100, 107, 324 So.2d 256, 260 (1976). "Administrative law" is not an expression of the popular will produced through the labors of elected representatives. Despite the protestations of its supporters that agency accountability exists through the elected head of the executive branch, the bureaucratic nature of, and the broad discretion given to, agencies makes any sort of accountability difficult at best, and impossible where independent agencies are concerned.
Such broad delegations of power play an important part in a state's interaction with a federal administrative agency, as this case demonstrates. Through a myriad of environmental statutes, Congress has given the EPA broad-ranging discretion to implement and enforce a national environmental policy.[1] Based upon this delegation of power, the EPA then dictates to its state counterpart agencies (ADEM in Alabama) what they must do. The ability to hold someone accountable for the regulations that result from this arrangement becomes even more problematic because EPA delegates a portion of its power to the state agencies to allow for administrative discretion.
In this case, the Clean Water Act gives the EPA the authority to implement a national pollutant discharge elimination system; it is on the basis of that authority that the EPA commands ADEM to implement *71 a policy for the purpose of preventing water pollution. The EPA apparently was not pleased with ADEM's attempts to implement an antidegradation policy; indeed, the regional administrator sent a letter to ADEM indicating that if the policy was not implemented promptly, the EPA would have to perform this task for ADEM. Even though the letter was not a direct command, ADEM took the EPA's warning seriously and implemented an antidegradation policy copying almost exactly the EPA's federal policy.
We can fault ADEM in this process, as this Court's opinion properly does, for failing to submit the antidegradation forms and procedures for publication and public comment before their enactment, as the AAPA requires it to do. After all, the public notice and comment requirements of the AAPA constitute the only real public involvement that exists in the agency lawmaking process. Although the regulations do not conform to the traditional requirements that give laws their binding force, at least the AAPA provides some measure of protection for the public.
We cannot fault ADEM, however, for reacting as it did in following the request in the EPA's letter quickly and for copying almost exactly what the EPA itself has done in the area of antidegradation. Congress has given the EPA the power to take over a state's environmental policy, should the EPA feel that the state's efforts are not meeting the EPA standards. Congress has given the EPA broad discretion to implement policy concerning the nation's air, water, and land quality. It would be foolish for ADEM not to listen to the EPA, even when the EPA simply suggests, rather than orders, how something ought to be done, because Congress has made the EPA the master of its domain. Thus, Alabama's environmental policy will likely reflect national environmental policy, regardless of whether Alabama's government or its citizens agree with that policy.
This case typifies, in a nutshell, the problems with administrative agencies: they formulate, implement, and adjudicate regulations that have the force of law, without having the legitimacy of the will of the people behind them. The justification repeatedly given in response to this charge is that this is the only way today's government can be expected to operate efficiently, given its responsibilities. "[I]f the combination of the three kinds of power in a single institution of government is unconstitutional, the entire structure of government must be changed radically. The new structure of government would be far less efficient than the present structure." Davis & Pierce, supra, § 2.3 at 38.
An argument concerning efficiency does not answer the questions regarding the constitutional legitimacy of current agency actions. As Justice Douglas observed:
"`The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.'"
Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 629, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Douglas, J., concurring), quoting Myers v. United States, 272 U.S. 52, 85, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). That the business of government supposedly cannot be done without the work of this "fourth branch" suggests not that the powers granted these agencies are necessary, but that perhaps the functions performed by these agencies should not be undertaken by the government at all. The Constitution certainly *72 does not demand that government accept responsibility for many of these regulatory functions; indeed, the Constitution's structure would seem to preclude accepting such responsibility, if agencies as they exist today are in reality the only way government can perform those functions.
As it stands, it appears that these agencies and the powers they possess will not change any time soon. Consequently, it is incumbent upon this Court to ensure, so far as we are able, that administrative agencies follow the laws that govern them, such as the AAPA, as closely as possible. ADEM should have placed its antidegradation forms and procedures up for public notice and comment before they were implemented, which is why we are reversing the judgment of the Court of Civil Appeals in this case. I concur in our opinion, but we should not be surprised by the problems associated with administrative agencies that brought this case before us, and I urge a rethinking on the fundamental issues that underlie it, for the sake of our republic.
HOUSTON, Justice (dissenting).
To all intents and purposes Alabama Department of Transportation v. Blue Ridge Sand & Gravel, Inc., 718 So.2d 27 (Ala.1998), is identical to the case before us. Clearly, the Alabama Department of Transportation ("ALDOT") and the Alabama Department of Environmental Management ("ADEM") are distinct agencies with distinct statutory missions, and ADEM's predicament is distinct from ALDOT's in Blue Ridge Sand & Gravel. However, to the extent that ALDOT deferred to federal overseers in Blue Ridge Sand & Gravel and to the extent that ADEM deferred to federal overseers in this case, the cases are identical. The effect of the deferral is the crucial element in each case: a state agency's performance of its federal overseer's requirements does not require rulemaking by that state agency; the state agency is merely deferring to the federal overseer's interpretation of federal regulations, not creating new state rules. "[T]he exception in [Ala.Code 1975,] § 41-22-3(9) for requirements imposed by federal rule or regulation is a reasonable exception to the definition of `Rule.'" Blue Ridge Sand & Gravel, 718 So.2d at 31.
I would quash the writ. The decisions of the trial court and the Court of Civil Appeals are correct and are due to be affirmed. Therefore, I dissent.
NOTES
[1] The observations made here ignore the different, but equally important, question whether the EPA even has the authority to regulate the environment. The absence in the United States Constitution of the word "environment" or anything remotely conveying a similar idea indicates that the EPA specifically and the federal government in general has no such authority.