922 So.2d 101 (2005)
ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT and Alabama Environmental Management Commission
v.
LEGAL ENVIRONMENTAL ASSISTANCE FOUNDATION, INC.
No. 2030878 and 2040311.
Court of Civil Appeals of Alabama.
August 12, 2005.
*104 Troy King, atty. gen., and James L. Wright, asst. atty. gen., Alabama Department of Environmental Management, and Robert Tambling, asst. atty. gen., Alabama Environmental Management Commission, for appellants.
David A. Ludder, Tallahassee, Florida, for appellee.
Robert P. Fowler and Steven A. Burns of Balch & Bingham, LLP, Birmingham, for amici curiae Business Council of America and the Alabama Coal Association, in support of the appellants.
Vivian Vines Campbell of Whatley Drake, LLC, Birmingham, for amici curiae Cahaba River Society, Alabama Rivers Alliance, Inc., Mobile Bay Watch, Inc./Mobile Baykeeper, in support of the appellee.
PITTMAN, Judge.
The Alabama Department of Environmental Management ("ADEM") and the Alabama Environmental Management Commission ("the Commission") appeal from a judgment of the Montgomery Circuit *105 Court declaring invalid certain water-quality regulations promulgated by ADEM (case no. 2030878). We reverse and remand. ADEM and the Commission also appeal from a subsequent order entered by the trial court (case no. 2040311); we dismiss that appeal.
These appeals arise from a long-standing dispute between ADEM and the Legal Environmental Assistance Foundation, Inc. ("LEAF"). Much of the pertinent factual and legal background was summarized by our Supreme Court in an earlier opinion:
"The Federal Antidegradation Policy, 40 C.F.R. § 131.12, requires a state to `develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy.' The Federal Antidegradation Policy specifies that statewide `policy and implementation methods shall, at a minimum, be consistent with the following': (1) protect existing uses of `instream water' and protect the level of water quality necessary to protect the existing uses; (2) maintain and protect `the quality of waters exceed[ing] levels necessary to support propagation of fish, shellfish, and wildlife' unless a state finds that lower water quality is necessary, but, in any event, the state must assure `water quality adequate to protect existing uses fully'; (3) assure that water quality and uses are not lowered below the existing statutory and regulatory requirements; and (4) maintain and protect high-quality waters where those waters constitute `an outstanding National resource.' 40 C.F.R. § 131.12 (emphasis added).
"ADEM revised its statewide `antidegradation policy,' Ala. Admin. Code (ADEM) Rule 335-6-10-.04, effective April 3, 1991, in response to the mandates of the Federal Antidegradation Policy. However, the amended statewide antidegradation policy adopted by ADEM did not contain any methods or procedures for implementing the policy.
"In 1995, LEAF complained to the EPA [i.e., the United States Environmental Protection Agency] that ADEM had not adopted any methods or procedures to implement the revised antidegradation policy. In April 1997, the EPA regional administrator for Region IV in Atlanta informed ADEM by letter that he was `considering a recommendation' to the EPA administrator in Washington that `a federal promulgation is necessary to bring the statewide antidegradation policy into compliance with the requirements of the Clean Water Act.' He asked ADEM `to take appropriate actions.' The EPA regional administrator informed ADEM that if, within 90 days of its receipt of the letter, ADEM did not submit procedures to implement the statewide antidegradation policy, then he would recommend that the EPA administrator in Washington `prepare and publish proposed federal regulations setting forth a revised statewide antidegradation policy.'
"Shortly thereafter, ADEM developed and adopted the Implementation Procedures now at issue before us [i.e., Implementation Procedures for Tier 2 of the Antidegradation Policy, Ala. Admin. Code (ADEM) Rule 335-6-10-.04(03)], which allow the maximum pollution allowable under the Federal Antidegradation Policy and which establish the criteria to be met, and the procedures to be followed to demonstrate that those criteria have been met, by applicants for permits to discharge pollutants into Alabama waterways. The Implementation Procedures contain an intermingling of forms and procedures. On August 25, 1999, the EPA regional administrator for Region IV approved the Implementation Procedures."
*106 Ex parte Legal Envtl. Assistance Found., Inc., 832 So.2d 61, 63-64 (Ala.2002) ("LEAF I"). In LEAF I, the Alabama Supreme Court held that the Implementation Procedures for Tier 2 of the Antidegradation Policy, Ala. Admin. Code (ADEM) Rule 335-6-10-.04(03), were invalid because those procedures had not been adopted in a manner consistent with the rulemaking provisions contained in the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala.Code 1975 ("AAPA"), and in § 22-22A-8, Ala.Code 1975, a portion of the Alabama Environmental Management Act ("AEMA"). LEAF I, 832 So.2d at 67.
On June 26, 2002, the Commission adopted Ala. Admin. Code (ADEM) Rule 335-6-10-.12, a regulation that implements ADEM's antidegradation policy in a manner similar to that endorsed by the procedures at issue in LEAF I. LEAF filed a seven-count civil action in the Montgomery Circuit Court naming as defendants ADEM, the Commission, and various individuals in their official capacities[1] and seeking the following relief: a declaration that Rule 335-6-10-.12 was invalid; an injunction barring ADEM, the Commission, and its members and agents from "invoking" the rule "for any purpose"; an award of costs and attorney fees; and other and further relief. ADEM and the Commission moved to dismiss the complaint or, in the alternative, for a stay pending administrative-review proceedings, a motion that LEAF opposed. After the trial court denied that motion, ADEM and the Commission answered the complaint; the parties then filed cross summary-judgment motions as to the claims asserted by LEAF. The trial court entered a partial summary judgment in favor of ADEM and the Commission on Count VII of the complaint (which had sought a declaration that the Commission's notice of intended adoption of Rule 335-6-10-.12 had violated Ala.Code 1975, § 41-22-5) but denied all other requested relief.
On May 24, 2004, the trial court entered a one-page summary judgment in favor of ADEM and the Commission as to all of the remaining counts of LEAF's complaint. However, on June 9, 2004, within the 30-day period following the entry of the trial court's final judgment, that court, on its own motion, vacated the summary judgment as having been inadvertently entered, and on June 15, 2004, that court entered a 28-page summary judgment in favor of LEAF and enjoined the defendants from implementing Rule 335-6-10-.12 and a related "alternatives-analysis" form that had been adopted by the Commission. ADEM and the Commission appealed from that judgment, which was stayed by the trial court pending appeal; this court assigned that appeal case no. 2030878.
On September 20, 2004, while the appeal in case no. 2030878 was pending, LEAF (with leave of this court) filed a motion, pursuant to Rule 60(b), Ala. R. Civ. P., seeking relief from the May 24, 2004, summary judgment in favor of ADEM and the Commission, despite the fact that that judgment had already been vacated on June 9, 2004, and had been superseded by the June 15, 2004, judgment in favor of LEAF. On December 7, 2004, the trial court entered an order that confirmed that it had vacated the May 24, 2004, summary judgment on its own motion and "reaffirmed" its June 15, 2004, *107 judgment. Although ADEM and the Commission have filed a notice of appeal from the trial court's December 7, 2004, order (case no. 2040311), we conclude that that appeal challenges the entry of an order that does not substantively aggrieve them and that that appeal is due to be dismissed as superfluous. Cf. Boat Shack II, Inc. v. ITT Comm. Fin. Corp., 584 So.2d 1354, 1360 (Ala.1991) (dismissing second appeal taken after entry of judgment pursuant to appellate court's remand in first appeal); Jones v. Lanthrip, 765 So.2d 682, 682 (Ala. Civ.App.2000) (dismissing second appeal taken after denial of postjudgment motion seeking vacatur of judgment from which first notice of appeal had been taken); and Sheffield v. Stoudenmire, 553 So.2d 125, 127 (Ala.1989) (second appeal from same judgment dismissed as redundant).
ADEM and the Commission contend that the trial court had no jurisdiction to enter the June 15, 2004, summary judgment in favor of LEAF because, they say, the trial court lacked the power to make any changes to the May 24, 2004, judgment other than to correct clerical errors pursuant to Rule 60(a), Ala. R. Civ. P. However, "[p]ursuant to Rule 59, Ala. R. Civ. P., a trial court may amend a judgment on its own motion within 30 days after it enters a judgment." Ennis v. Kittle, 770 So.2d 1090, 1091 n. 1 (Ala.Civ.App. 1999); see also Ex parte Owen, 420 So.2d 80, 81 (Ala.1982) (noting trial court's discretion to amend a judgment sua sponte within 30 days of its entry, although observing that the "better practice" would be for that court "to give notice of [any] intention to amend an order on [its] own initiative"). The trial court thus did have jurisdiction to vacate the May 24, 2004, summary judgment on June 9, 2004, and to thereafter enter a new judgment in favor of LEAF.
The remaining issues presented on appeal focus on the propriety of LEAF's challenges to the validity of Rule 335-6-10-.12. Because of the central importance of that rule to the disposition of the instant appeal, we quote it at length:
"(1) The antidegradation policy at Rule 335-6-10-.04 addresses three categories of waters/uses:
"(a) High quality waters that constitute an outstanding national resource (Tier 3);
"(b) Waters where the quality exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water (Tier 2); and
"(c) Existing instream water uses and the level of water quality necessary to protect the existing uses (Tier 1).
"(2) Tier 3 waters are those waters designated pursuant to the Outstanding National Resource Water (ONRW) special designation at Rule 335-6-10-.10, and are identified in Rule 335-6-11-.02.
"(3) Tier 1 waters are:
"(a) Those waters (except waters assigned the use classification of Outstanding Alabama Water, which are Tier 2 waters) identified on the most recent EPA-approved Section 303(d) list;
"(b) Those waters (except waters assigned the use classification of Outstanding Alabama Water, which are Tier 2 waters) for which attainment of applicable water quality standards has been, or is expected to be, achieved through implementation of effluent limitations more stringent than technology-based controls (BPT [best practicable control technology currently available], BAT [best available technology], and secondary treatment); and

*108 "(c) Those waters assigned the use classification of Limited Warmwater Fishery or Agricultural and Industrial Water Supply (as identified in Rule 335-6-11-.02).
"(4) Tier 2 waters are all other waters (those waters not identified as either Tier 3 waters or Tier 1 waters), including all waters assigned the use classification of Outstanding Alabama Water (as identified in Rule 335-6-11-.02).
"(5) All new or expanded discharges to Tier 2 waters (except discharges eligible for coverage under general permits) covered by the NPDES [National Pollutant Discharge Elimination System] permitting program are potentially subject to the provisions of Rule 335-6-10-.04(3). Applicants for such discharges are required to demonstrate that the proposed discharge is necessary for important economic or social development as a part of the permit application process.
"(6) After receipt of a permit application for a potentially covered discharge, the Department will determine whether the proposed discharge is to a Tier 2 water, as defined in paragraph (4) above. Of necessity, this determination will be made on a case-by-case basis.
"(7) The basic framework of the permitting process is unchanged for a covered discharge to a Tier 2 water. However, the process is enhanced to document the consideration of Tier 2 provisions. The additional documentation includes:
"(a) The Department's determination that the application is for a new or expanded discharge;
"(b) The Department's determination that the receiving stream is considered to be a Tier 2 water; and
"(c) The Department's determination, based on the applicant's demonstration, that the proposed discharge is necessary for important economic or social development in the area in which the waters are located.
"(8) All three items will be documented in the permit file and/or fact sheet, and will be used by the Department in its decision process. The public notice process will be used to announce a preliminary Department decision to deny or to allow a covered discharge to a Tier 2 water, while the final determination will be made concurrently with the final Department decision regarding the permit application for a covered discharge.
"(9) Documentation by the applicant shall include:
"(a) An evaluation of discharge alternatives completed by a Registered Professional Engineer licensed to practice in the State of Alabama.
"1. The applicant shall document the discharge alternatives evaluation by completing and submitting the following forms, or by submitting the same information in another format acceptable to the Department:
"(i) ADEM Form 311, Alternatives Analysis; and, as applicable,
"(ii) ADEM Form 312, Calculation of Total Annualized Costs for Public-Sector Projects, or ADEM Form 313, Calculation of Total Annualized Costs for Private-Sector Projects. Alternatives with total annualized project costs that are less than 110% of the total annualized project costs for the Tier 2 discharge proposal are considered viable alternatives.
"(b) A demonstration that the proposed discharge will support important economic or social development in the area in which the waters are located, *109 documented by the applicant's response, in writing, to the following questions. The applicant shall provide supporting information for each response.
"1. What environmental or public health problem will the discharger be correcting?
"2. How much will the discharger be increasing employment (at its existing facility or as the result of locating a new facility)?
"3. How much reduction in employment will the discharger be avoiding?
"4. How much additional state or local taxes will the discharger be paying?
"5. What public service to the community will the discharger be providing?
"6. What economic or social benefit will the discharger be providing to the community?
"(10) The following forms are embodied in this rule:
"(a) ADEM Form 311  Alternatives Analysis
"(b) ADEM Form 312  Calculation of Total Annualized Costs for Public-Sector Projects
"(c) ADEM Form 313  Calculation of Total Annualized Costs for Private-Sector Projects[.]"
In Count VI of its complaint, LEAF asserted a challenge to the rule as a whole based upon what LEAF deemed to be an insufficient pre-promulgation statement of reasons for its adoption. The statutory basis of LEAF's challenge was that portion of Ala.Code 1975, § 22-22A-8(a), that states that "[u]nless different notice provisions are specifically required elsewhere by law," ADEM is to provide 45 days' public notice of an impending public hearing of the Commission on the proposed adoption, amendment, or repeal of a state environmental rule and simultaneously is to "make available ... summaries of the reasons supporting [the] adoption, amendment, or repeal" of the pertinent rules (emphasis added). It is undisputed that before the adoption of Rule 335-6-10-.12, ADEM timely issued the following "summary of reasons" that, in its view, supported the adoption of Rule 335-6-10-.12 as an administrative rule:
"An antidegradation policy is included in Alabama's water quality standards at Rule 335-6-10-.04, and was approved in 1991 by the U.S. Environmental Protection Agency, Region 4. In 1997, EPA requested that ADEM develop written procedures for implementation of the antidegradation policy; final procedures were submitted to EPA in December 1998 and approved by EPA in August 1999.
"In November 1999, [LEAF] sued ADEM alleging [ADEM's] use of the EPA-approved procedures in the NPDES permit process was improper because the procedures were, in fact, `rules' but had not been adopted through the formal rulemaking process. The Montgomery Circuit Court found in favor of ADEM, a decision that was later affirmed by the Court of Civil Appeals. LEAF then applied for a writ of certiorari [in] the Alabama Supreme Court, which was granted, and thereafter the Alabama Supreme Court concluded in a decision dated March 1, 2002, that the implementation procedures are `rules' within the context of the [AAPA], reversed the judgment of the Court of Civil Appeals, and remanded the case to the lower courts.
"As a result of the Supreme Court decision, [ADEM] ceased the review of permit applications for new or expanded *110 discharges of treated wastewater to those waters affected by the Supreme Court decision until April 10, 2002, following adoption by the ... Commission of an emergency rule ([Rule] 335-6-10-.12-.01ER) establishing implementation procedures. As adopted, the emergency rule procedures reflect suggestions made by EPA and are essentially equivalent to the written procedures utilized by [ADEM] prior to the Supreme Court decision. Pursuant to the [AAPA], an emergency rule is effective for not more than 120 days; for Rule 335-6-10-.12-.01ER, the effective period ends August 6, 2002."
LEAF contends (and the trial court agreed) that the foregoing statement does not satisfy the statutory requirement that ADEM provide "summaries of the reasons supporting" the adoption of Rule 335-6-10-.12 because the reasons provided do not justify the adoption of particular provisions included therein. We disagree. ADEM's statement indicates that the implementation procedures set forth in Rule 335-6-10-.12 had, in essence, been in place at ADEM since their approval by the EPA in August 1999 and that continuation of the procedures was vital to ADEM's continued fulfillment of its statutory function of passing upon wastewater-discharge permit applications (see § 22-22A-5(1) and (10), Ala. Code 1975). While ADEM might have chosen to also provide an explanation for particular language in the rule as a part of its "summary," the trial court erred in sustaining LEAF's contention that a fuller explanation for seeking adoption of the rule than that provided by ADEM was required by the Legislature in the plain language of § 22-22A-8(a). Moreover, ADEM's pre-adoption statement of reasons for adopting Rule 335-6-10-.12 did not prevent LEAF, through its counsel, from filing commentary in opposition to the proposed rule, including excerpts from LEAF's own administrative petition seeking revisions to other environmental rules in which it sought, in its words, "to establish improved antidegradation implementation procedures." Rule 335-6-10-.12 is thus not void in its entirety on the basis that § 22-22A-8(a) was not followed.
We now turn to LEAF's more particularized challenges to portions of the rule as adopted. The first question presented concerns the propriety of the rule's reference, in its definition of "Tier 1" waters, of waters "identified on the most recent EPA-approved Section 303(d) list." "Section 303(d)" refers to Section 303(d) of the "Clean Water Act" ("CWA"), i.e., the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92-500, 86 Stat. 846, which amended the Federal Water Pollution Control Act of 1948 (Act June 30, 1948, c. 758, 62 Stat. 1155); that section is codified at 33 U.S.C. § 1313(d). The operation of Section 303(d) was succinctly summarized by the United States District Court for the District of Columbia in Bravos v. Green, 306 F.Supp.2d 48 (D.D.C. 2004):
"Nonpoint source pollution is primarily regulated by the States through the water-quality approach. Section 303(d) of the CWA requires each State to identify and rank those waters within its boundaries where technology-based controls are inadequate to attain quality water standards. Such substandard waters are termed `water quality limited segments' (`WQLSs') and are listed on a State's § 303(d) list. The State must submit documentation to its EPA Regional Administrator supporting its decision to list, or not list, waters on its § 303(d) list. For each body of water identified on its § 303(d) list, the State must establish the body's total maximum daily load (`TMDL'). Simply stated, `[a] TMDL is the maximum amount of a *111 pollutant that can be added to a waterbody (its "loading capacity") without exceeding water quality standards.' Each TMDL must `be established at [a] level[] necessary to attain and maintain the applicable narrative and numerical [water quality standards,("WQS")], with seasonal variations and a margin of safety [taking] into account any lack of knowledge concerning the relationship between effluent limitations and water quality.'"
306 F.Supp.2d at 51 (footnote and citations omitted). Under current federal law, a "Section 303(d) list" of a state's impaired waters must be prepared by state environmental authorities and revised every two years. See 40 C.F.R. § 130.7(d) (2004).
LEAF contends (and the trial court agreed) that the reference in Rule 335-6-10-.12 to Alabama's Section 303(d) list was improper. That contention is based upon three principal arguments that correspond to the allegations, respectively, of Counts I, II, and III of LEAF's complaint: (1) that the rule's reference to the list adopts matter by reference in contravention of Ala.Code 1975, § 41-22-9; (2) that the reference to the list adopts future matter by reference in violation of Ala.Code 1975, §§ 22-22A-8 and 41-22-5; and (3) that the reference to the list improperly delegates environmental rulemaking authority to the EPA. We address those arguments in turn.
Ala.Code 1975, § 41-22-9, provides:
"An agency may adopt, by reference in its rules and without publishing the adopted matter in full, all or any part of a code, standard or regulation which has been adopted by any other agency of this state or any agency of the United States or by a generally recognized organization or association approved by the joint committee administrative regulation review. The reference shall fully identify the adopted matter by date and otherwise. The agency shall have available copies of the adopted matter for inspection and the rules shall state where copies of the adopted matter can be obtained and any charge therefor as of the time the rule is adopted."
In considering the propriety of the reference in Rule 335-6-10-.12 of the Alabama Section 303(d) list, the threshold question arises: did the Commission actually adopt the list in adopting the rule such that § 41-22-9 applies? We agree with ADEM and the Commission that the mere reference in Rule 335-6-10-.12 to the Section 303(d) list, a document that, although not itself a "rule,"[2] has independent significance in environmental law, does not amount to the "adoption" of another governmental agency's or other body's "code, standard or regulation." Rather, the rule simply includes waters appearing on the most recent Section 303(d) list prepared by ADEM  waters that are already identified by ADEM as substandard under the CWA and its regulations  within the "Tier 1" classification of waters that are subject to somewhat more lenient state antidegradation standards. While § 41-22-9 would expressly allow a state agency to adopt certain documents prepared by other agencies or bodies as rules, we have been directed to no portion of the AAPA that would prohibit ADEM from proposing, and the Commission from adopting, a rule that refers to a current ADEM-prepared document.
At bottom, LEAF's adoption-of-future-matter challenge to Rule 335-6-10-.12(3)(a) *112 suffers from the same defect as LEAF's adoption-by-reference challenge. There is nothing in the AAPA or in the AEMA that expressly bars ADEM from proposing, or the Commission from adopting, rules that refer to a document that must, as a matter of federal law, be compiled, updated, and maintained by ADEM as the state's water-pollution-control agency. Although LEAF argues that future Section 303(d) lists adopted by ADEM will not be vetted by the notice-and-hearing procedures envisioned by the AEMA and the AAPA that took place before the Commission adopted Rule 335-6-10-.12 itself, the deputy chief of ADEM's water division has testified by affidavit that the list, although not a "rule," is itself subject to public notice and comment at both the state and federal levels. Accord, 40 C.F.R. §§ 130.7(d)(2) and 131.20(b) (2004). It would seem a duplication of the state's limited resources for the Legislature to require ADEM and the Commission to adopt new antidegradation implementation procedures upon each revision of the state's § 303(d) list that might possibly reclassify certain discrete bodies of water, and we will not impute to the Legislature such a wasteful intent where the pertinent state statutes are utterly silent.
Does the rule's reference to the Section 303(d) list improperly delegate rulemaking authority to the EPA, as LEAF contends? Under Alabama law, "there is nothing inherently wrong with the subdelegation of power and authority by agencies created and empowered by legislative act to serve a public purpose." Alabama Surface Mining Reclam'n Comm'n v. Jolly, 362 So.2d 919, 920 (Ala. Civ.App.1978) (emphasis added); accord, City of Bessemer v. Personnel Bd. of Jefferson County, 420 So.2d 6, 9 (Ala.1982). However, even if Alabama law did bar ADEM and the Commission from vesting in EPA a portion of their power to make environmental rules, Rule 335-6-10-.12(3)(a) could not properly be interpreted as having that effect. A Section 303(d) list such as Alabama's is a creature of federal law, not state law: although ADEM is required to prepare and revise the list by virtue of its designation by the Legislature as Alabama's water-pollution-control agency for the purposes of the federal CWA (see Ala.Code 1975, § 22-22A-4(n)), the EPA has been delegated authority by Congress to approve or disapprove all or any part of a state's Section 303(d) list (see 33 U.S.C. § 1313(d)(2)). That said, however, a change in the Section 303(d) list, whether initiated by ADEM or by the EPA, does not ipso facto amend Rule 335-6-10-.12(3)(a) in violation of the AEMA, although such changes may widen or narrow the class of Tier 1 waters and thereby incidentally affect ADEM's permitting process. LEAF's challenges to the validity of Rule 335-6-10-.12(3)(a) are thus not legally sound, and the trial court erred in sustaining them.
In Count IV of its complaint, LEAF assailed subsection (9)(a)(1) of Rule 335-6-10-.12, under which those who wish to initiate a new or an expanded discharge into "Tier 2" water must supply ADEM with certain documentation, prepared by a registered engineer, pertaining to "discharge alternatives." That subsection, as well as an allied "Alternatives Analysis" form, states that "[a]lternatives with total annualized project costs that are less than 110% of the total annualized project costs for the Tier 2 discharge proposal are considered viable alternatives." According to LEAF (and the trial court's judgment), the so-called "110 percent rule" is arbitrary and violative of Section 6 of the Alabama Constitution of 1901. LEAF cites Friday v. Ethanol Corp., 539 So.2d 208 (Ala.1989), for the proposition that the due-process *113 guaranty of that section is violated when a regulation "imposes restrictions that are unnecessary and unreasonable upon the pursuit of useful activities in that they do not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or the general prosperity." 539 So.2d at 216. We will assume, without deciding, that the adoption of the so-called "110 percent rule" amounts to a "restriction" upon the freedom of the members of LEAF to participate in recreation upon all of Alabama's waterways. It remains to be considered, however, whether the "110 percent rule" is unconstitutional based upon the absence of some relationship to public health, welfare, or prosperity.
In Alabama Power Co. v. Citizens of Alabama, 740 So.2d 371 (Ala.1999), the Supreme Court cautioned the judiciary against "reevaluat[ing] the broad policy considerations inherent in crafting economic policy," and simultaneously reiterated that economic regulations should not be declared invalid "[i]f there is `any state of facts either known or which could reasonably be assumed,' that would establish a rational relationship between the economic regulation and a legitimate state interest." 740 So.2d at 381. In enacting the AEMA, the Legislature charged ADEM with the responsibility not only of "administering environmental legislation," but also of "promot[ing] economy and efficiency in the operation and management of environmental programs," of "timely resol[ving] permitting actions," and of "insur[ing] that government is responsive to the needs of the people and sufficiently flexible to meet changing conditions." Ala.Code 1975, § 22-22A-2(1). Moreover, ADEM, acting through the Commission, is delegated the power to "develop environmental policy for the state." Ala.Code 1975, § 22-22A-5(3). In carrying out those duties, ADEM must have the discretion to decide whether, at some level, the "needs of the people" of Alabama will be better served by placing upper limits upon the costs of permit applicants' industrial plants and equipment than by requiring massive and inefficient expenditures from those applicants in order to achieve marginal improvements in water quality. While the authority to make such choices might well have been retained by the Legislature had that body elected to do so, ADEM and the Commission, as the Legislature's delegates, succeed to that body's plenary power to manage the delicate balance between the economy and the environment of Alabama.
In this case, ADEM proposed, and the Commission adopted, a rule in substantial conformity to guidelines suggested by EPA's regional administrator. The record reflects that that official sent a letter to ADEM's general counsel in 1997 in which he urged revision of state environmental regulations so as to require consideration of alternative treatment methods. The enclosures with that letter included an "Antidegradation Manual" issued by one of EPA's regional water-management divisions in which the following "rule of thumb" is set forth: "nondegrading or less-degrading pollution control alternatives with costs that are less than 110% of the costs of the pollution control measures associated with the proposed activity shall be considered reasonable." EPA's regional administrator went so far as to warn that "[i]f the State cannot or will not make such revisions, I am prepared to recommend an EPA promulgation of federal standards." Had that official done so, the expressed policy of the Legislature that the state "retain ... the control over its air, land and water resources" (Ala.Code 1975, § 22-22A-2(2)) would necessarily have been thwarted.
*114 The "110 percent rule," like the remainder of Rule 335-6-10-.12, was presented to the EPA before its promulgation as a rule and was approved by that agency as being "consistent with the requirements of the Clean Water Act and the applicable provisions of 40 C.F.R. § 131.12(a)." As adopted, the "110 percent rule," like many regulations and parts of regulations, reflects a compromise between environmental and broader economic concerns, a compromise that the judiciary should be loath to disturb. Although the trial court summarily rejected the rationality of the "110 percent rule," we easily perceive that Rule 335-6-10-.12(9) and its associated forms are rationally related to the goals of preventing federal preemption of state control of water resources and of establishing definite limits with respect to environmental cost burdens upon permit applicants, burdens that may chill industrial development and harm the public in the name of increased water quality. The trial court thus erred in invalidating the "110 percent rule" on due-process grounds.
The final contention asserted by LEAF against the validity of various components of Rule 335-6-10-.12 is a void-for-vagueness due-process[3] challenge (asserted in Count V of its complaint) to those portions of the rule providing that applicants seeking permits for new or expanded discharges to Tier 2 waters must demonstrate to ADEM that the proposed discharge "is necessary for important economic or social development." We note that that criterion has its origin in an EPA regulation that requires states to "identify methods for implementing" a statewide antidegradation policy that is consistent with the following statement:
"Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located."
40 C.F.R. § 131.12(a)(2) (2004) (emphasis added).
We recognize that certain commentators have criticized the federal antidegradation standard as being "vague." E.g., Mary A. Stilts, Note, "The Ever-Changing Balance of Power in Interstate Water Pollution: Do Affected States Have Anything to Say After Arkansas v. Oklahoma?," 50 Wash. & Lee L.R. 1341, 1358-59 (Summer 1993). But the pertinent question here is whether that standard, as carried forward into Rule 335-6-10-.12, is so vague as to be unconstitutional. That question devolves to whether the regulation is "`so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty,'" what was intended. See Alabama Power Co., 740 So.2d at 387 (quoting Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50 (1962)).
We conclude, without hesitation, that the references in Rule 335-6-10-.12 to economic-developmental or social-developmental necessity fulfill those constitutional minima, especially as amplified by the specific *115 disclosures that permit applicants must make under the rule (including environmental or public-health problems to be corrected, anticipated employment increases or reduction in employment decreases resulting from the granting of the permit, and any additional state or local taxes to be paid by the applicant). See Rule 335-6-10-.12(9)(b)(1)-(5). The criteria are intended to assist ADEM in determining whether the existence of any potential benefit from a proposed project may offset the incidental detriment to quality of life resulting from the increase in pollution. The wording of Rule 335-6-10-.12, far from being too vague to be executed, places both proponents and opponents of a contested permit request on notice that ADEM will not determine potential water-pollution concerns raised by such an application in a vacuum, but will instead seek guidance from parties to such contests concerning the overall benefit or detriment to the citizens of Alabama that may result from a decision granting the application. Accord, Ala. Admin. Code (ADEM) Rule 335-6-10-.04(3). The rule at issue is thus sufficiently definite so as to comport with due process, and the trial court erred in sustaining LEAF's contention to the contrary.
For the foregoing reasons, we reverse the judgment of the trial court. The cause is remanded for the entry of a judgment in favor of ADEM and the Commission. The appellants' motion to strike certain exhibits attached to the brief submitted by amici curiae appearing in support of the appellee is denied. Wilson v. Crosby Lumber Co., 386 So.2d 1173, 1174-75 (Ala.Civ.App. 1980).
2030878  MOTION TO STRIKE DENIED; REVERSED AND REMANDED.
2040311  APPEAL DISMISSED.
THOMPSON J., concurs.
MURDOCK, J., concurs in the result, with writing, which CRAWLEY, P.J., joins.
BRYAN, J., recuses himself.
MURDOCK, Judge, concurring in the result.
Though I cannot agree with all of the statements made in the main opinion, I concur in the result reached by that opinion. As to the "110 percent rule" and the "necessary-for-important-economic-or-social-development" standard, the issue before us is not the wisdom of those standards or whether they adequately meet statutory and policy objectives. Instead, the issue before this court is whether either of those standards amounts to a violation of the due-process clause of Alabama's Constitution, Ala. Const. of 1901, Art. 1, § 6. I concur in the result because I cannot conclude that they do.
CRAWLEY, P.J., concurs.
NOTES
[1] Those individuals included the members of the Commission, ADEM's director, and the chiefs of ADEM's water and field-operations divisions. Because the individual defendants were sued in their official capacities, ADEM and the Commission represented the interests of the individual defendants in the trial court.
[2] See Missouri Soybean Ass'n v. Missouri Clean Water Comm'n, 102 S.W.3d 10, 23-25 (Mo.2003) (holding that Section 303(d) list of impaired waters does not establish standards of conduct having the force of law).
[3] The constitutional right to due process that is guaranteed under the Alabama Constitution of 1901, §§ 6 and 13, "is violated when a statute or regulation is unduly vague." Ross Neely Express, Inc. v. Alabama Dep't of Envtl. Mgmt., 437 So.2d 82, 84 (Ala.1983).